[No. 18734–1–I.   Division One.   January 25, 1988.]

THE STATE OF WASHINGTON, *Respondent,* v. JOLENE ALLEN, *Appellant.*

*Mark W. Muenster* and *Rita Griffith* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney, Deborah J. Phillips, Senior Appellate Attorney,* and *William Jaquette* and *Cindy Smith, Deputies,* for respondent.

PEKELIS, J.—Jolene Allen appeals her conviction for first degree murder. She contends that the trial court erred by: (1) denying her motion to strike a police officer's opinion testimony; (2) responding to a jury inquiry without notifying her or her attorney; (3) giving jury instructions on premeditation and proximate cause which, she claims, alleviated the State of its burden of proof; (4) prohibiting the defense from impeaching a witness with his prior conviction; and (5) permitting the State to impeach Jolene on a collateral matter through a rebuttal witness. We affirm.

## FACTS

In May of 1985, Jolene Allen separated from her husband, Chuck Allen. Chuck had battered Jolene regularly during their marriage, injuring her seriously on at least one occasion. A few months after she separated from Chuck, Jolene moved into the home of Toni Leonard. Thereafter, Chuck and Jolene frequently spoke on the telephone. Jolene wanted Chuck to cooperate in settling their divorce; she also wanted him to return some of her personal belongings. After these telephone calls, Jolene was often upset and angry. She told two of her boyfriends that she felt like killing or getting rid of Chuck.

In November of 1985, Jolene met Rick Femenella at the Sunnydale Tavern and at Christmas he asked her to marry him. On January 4, 1986, Chuck called Jolene and asked her to meet him at the Sea–Tac Tavern on Pacific Highway. She agreed but asked Rick to accompany her because she was afraid that Chuck would hurt her. Rick agreed to go, and they drove separately to the tavern.

At the tavern, Jolene found Chuck with his friend, Harold Atkins. Jolene talked to Chuck for several hours while Rick drank beer, shot pool and watched. Jolene and Chuck discussed the possibility of a reconciliation conditioned upon his remaining drug–free for a year. He agreed and asked her if she would live with him again, but Jolene refused. Chuck then began dancing with another woman. Jolene felt hurt and left the tavern. Rick left shortly thereafter and found Jolene at her house crying.

Rick told Jolene that he wanted to "go back [to the tavern] and slug" Chuck. Both Rick and Jolene were very intoxicated. Rick had consumed 28 beers and half a bottle of whiskey. Jolene had been drinking champagne all day and had taken a handful of antidepressant pills.

At this point Jolene's version of events departs from Rick's account. According to Rick, Jolene wanted to go back to the tavern with him and they rode there together in his blue pickup truck. Rick entered the tavern, saw Chuck dancing, and returned to Jolene. Jolene suggested that they park in the upper parking lot and wait for Chuck to leave the tavern, fearing that Rick would "get in trouble" if he confronted Chuck inside the tavern. Jolene told Rick that he had "better get a gun because [Chuck] carrie[d] a gun" so they drove to Rick's parents' house to get his shotgun. When they returned to the tavern with the gun, Jolene suggested that they wait for Chuck at Harold Atkins' home because Chuck would "drop off Harold at his house before [Chuck went] home". Jolene directed Rick to the Atkins residence. Rick testified that at this time he had abandoned his plan to beat up Chuck and decided he would only "warn" Chuck "to leave Joleen [sic] alone." When they arrived, Jolene told Rick to park his truck a block away.

Rick's claim that Jolene accompanied him to the Atkins' house was corroborated by the testimony of Robert Weisser, a neighbor of the Atkins. Weisser was awake watching television and heard a noisy truck drive past his house. He looked out the window. In the darkness he saw a light blue

pickup truck parked in the street and a woman with shoulder–length sandy brown hair sitting in the middle of the front seat.

Rick got out of the truck, and Jolene asked if his gun was loaded. When Rick replied that it was not, Jolene handed him a shotgun shell from the glove box in the truck. Rick walked up to the Atkins yard and stood by the side of the house. Chuck and Harold drove up and Rick met them walking up the path toward the house.

Mrs. Atkins opened the front door to find Rick pointing a shotgun at Chuck. Harold told her to shut the door and "call the cops." According to Harold, Rick twice asked Chuck if he was "Chuck Allen." When Chuck finally acknowledged who he was, Rick fired the shotgun. Rick, on the other hand, testified that Chuck lunged for the gun and when he stepped back, the gun accidentally discharged, striking Chuck. Rick ran to his truck, and he and Jolene quickly drove away.

Rick told Jolene that he had shot Chuck, and she said she would call Chuck's mother the following day to see what happened. Rick then dropped Jolene off at her house. Jolene told Rick to go to his parents' house, change his clothes, shave off his moustache, and leave the shotgun. He did so and later returned to Jolene's house where he spent the night.

According to Jolene, after Rick said he wanted to beat up Chuck, he told her they were going to his parents' house, but he did not say why. Jolene went with Rick and followed him inside. She remembered discussing a gun permit with Rick's brother, but could not recall seeing a gun. After they left Rick's house, Jolene testified that they fought about whether she would live with Chuck again. Jolene then asked Rick to drop her off at her house, which he did. She denied that she had accompanied Rick to the Atkins' house and claimed she did not see him until he came back to her home and they went to bed.

Jolene further testified that she called Chuck's number

the following day but it was busy. She then called Ilda Roland, her mother–in–law, and asked to have Chuck call her when he got off the telephone. Ilda informed Jolene that Chuck was dead. Ilda testified that with no emotion in her voice, Jolene asked her if she was "kidding." Jolene's testimony was that after Ilda informed her of Chuck's death, she was shocked, began crying and then took a tranquilizer.

Detective Tripp arrived shortly thereafter and told Jolene that he was investigating the death of her husband. He testified about Jolene's grief reaction and recounted statements she made during an interview at the police station. During the interview, Jolene did not reveal that Rick had accompanied her to the tavern or that they had gone to his parents' house.

Jolene and Rick were charged with first degree murder in the shooting death of Chuck. Their motions to sever the trials were granted. Rick was tried first and convicted of first degree manslaughter. Thereafter, Jolene was tried and convicted of premeditated first degree murder.

## ANALYSIS

### I

### OPINION TESTIMONY

Jolene contends that the trial court erred by refusing to strike Detective Tripp's testimony that Jolene's grief about her husband's death did not appear to be sincere. Over defense counsel's objection, Detective Tripp testified that although Jolene "appeared to be sobbing . . . her facial expression, the lack of tears, the lack of any redness in her face did not look genuine or sincere". Jolene contends that this testimony constituted an improper opinion on her guilt.

ER 704 provides: "Testimony in the form of an opinion or inferences otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the

trier of fact."[1] The trial court may, in its discretion, admit opinion testimony even when it concerns critical facts. However, opinion testimony on an ultimate issue of law, such as the defendant's guilt, is inadmissible. *State v. Carlin,* 40 Wn. App. 698, 701, 700 P.2d 323 (1985).

Jolene relies on *State v. Haga,* 8 Wn. App. 481, 507 P.2d 159, *review denied,* 82 Wn.2d 1006 (1973) and *State v. Sargent,* 40 Wn. App. 340, 698 P.2d 598 (1985) to support her contention that Officer Tripps' testimony constituted an improper opinion on her guilt. Both these cases are distinguishable, however. In *Haga,* an ambulance driver was asked whether the defendant showed any signs of grief in response to the news of his wife's death. Defense counsel did not object to this question and, in fact, implied that it was proper. *Haga,* 8 Wn. App. at 490. However, after the witness testified that the defendant showed no signs of grief, the prosecuting attorney went further and asked the witness to testify whether the defendant's reaction was "unusual" as compared to other spouses he had observed in similar situations. *Haga,* 8 Wn. App. at 490. The witness thus purported to testify as an "expert" on whether the defendant's reaction was that of a truly bereaved person. The court properly recognized that there was no such area of expertise:

> [t]he reactions of a person to sorrow or grief vary with the individual. It is a matter of common knowledge that some people undergo sorrow or bereavement with composure. Opinions as to what constitute evidences of grief also vary with the individual.

*Haga,* 8 Wn. App. at 491 (quoting *Harrelson v. State,* 217 Miss. 887, 891, 65 So. 2d 237 (1953)). In short, the testimony was not "otherwise admissible" because it violated ER 702.

---

[1]The requirement that the testimony be "otherwise admissible" implicates most frequently ER 401, ER 403, ER 701 and ER 702. 5A K. Tegland, Wash. Prac., *Evidence* § 308 (2d ed. 1982 & Supp. 1987).

Likewise in *Sargent,* a police officer was asked for his opinion of the defendant's response to news of his wife's death. He answered:

> My impression of his response? It was, his response kind of surprised me. Like I thought that he knew that his wife was dead and then he kind of went forward and says, "Lori, you mean something happened to Lori?" You know, I was somewhat taken aback because I thought he knew his wife was dead. And I don't know whether you can characterize his response as being contrived or—that's [the] impression I got.

(Italics omitted.) *Sargent,* 40 Wn. App. at 350. The court acknowledged that in some instances a witness may properly give an opinion on the sincerity of a response by the defendant (citing *State v. Wigley,* 5 Wn. App. 465, 467, 488 P.2d 766 (1971)), but excluded the police officer's opinion in *Sargent* because he was not personally acquainted with the defendant. However, the court apparently recognized that personal acquaintance with the defendant is not the only proper foundation for opinion testimony, noting that:

> a witness who has had some means of personal observation may relate the basis of his observation and then "state his opinion, conclusion, and impression formed from such facts and circumstances as came under his observation." (Italics deleted.)

(Citation omitted.) *Sargent,* 40 Wn. App. at 350 (quoting *State v. Jamison,* 93 Wn.2d 794, 798, 613 P.2d 776 (1980)). In *Sargent,* the officer's testimony lacked *any* proper foundation because he neither knew the defendant nor based his opinion on observable facts. Rather, his opinion was based only on his unexplained, and very possibly erroneous, assumption that the defendant already knew that his wife was dead.

In contrast, Detective Tripps' testimony that Jolene's crying was insincere was admissible because it was prefaced with a proper foundation: personal observations of Jolene's conduct factually recounted by the witness that directly and logically supported his conclusion. We conclude, therefore, that Detective Tripps' testimony did not constitute an

opinion on Jolene's guilt but was simply an explanation and summary of his admissible personal observations of Jolene's reaction to Chuck's death.

## II
### JURY INQUIRY

Jolene contends that the trial court committed prejudicial error by responding to a jury inquiry without first notifying her or her attorney.[2] During its deliberations, the jury sent the judge a written inquiry:

> Is the accomplce [sic] guilty of murder (1st degree) if she has encouraged the other person to threaten or beat up the victim and at the last moment the second party makes a decision to kill the victim. His act is premeditaive [sic] is she also guilty of premeditave [sic] murder.

In response, the trial court directed the jury to "[r]ead your instructions and continue with your deliberations." Jolene contends that had the trial court contacted her attorney, "it is possible that the court and counsel could have devised an instruction which would have helped resolve this problem for the jury."

Communications between judge and jury in absence of the defendant or defense counsel are clearly prohibited and therefore constitute error. *State v. Caliguri,* 99 Wn.2d 501, 508, 664 P.2d 466 (1983); *accord, State v. Langdon,* 42 Wn. App. 715, 717, 713 P.2d 120, *review denied,* 105 Wn.2d 1013 (1986). However, the State may prove beyond a reasonable doubt that the error was harmless. *Caliguri,* 99 Wn.2d at 509; *Langdon,* 42 Wn. App. at 717. Where the trial court's response to a jury inquiry is "negative in nature and conveys no affirmative information", no prejudice results. *State v. Russell,* 25 Wn. App. 933, 948, 611 P.2d 1320 (1980); *accord, State v. Safford,* 24 Wn. App. 783, 794, 604 P.2d 980 (1979), *review denied,* 93 Wn.2d 1026 (1980).

---

[2] Although the record is somewhat ambiguous as to whether defense counsel was present when the judge responded to the jury's inquiry, we will assume counsel was not present.

Here, the State has satisfied its burden of proving the court's communication was harmless error. The court's instruction was neutral and conveyed no affirmative information, merely directing the jury to refer to previous instructions. *See Langdon,* 42 Wn. App. at 717–18 (court's communication to the jury that it was "bound by those instructions already given to you" was neutral); *Safford,* 24 Wn. App. at 794 (court's direction to the jury that it "[r]ead the instructions" was harmless error). Moreover, the trial court was under no obligation to answer the jury's inquiry. *Langdon,* 42 Wn. App. at 718. Even if Jolene's counsel had been present, he could not have required the court to answer the jury's specific inquiry since whether to give further instructions is within the trial court's discretion. *Langdon,* 42 Wn. App. at 718. Thus, the trial court's response to the jury's inquiry was harmless error.

## III
### JURY INSTRUCTION

Jolene assigns error to the trial court's giving of two instructions on proximate cause (instructions 12 and 14) and the to–convict instruction for premeditated first degree murder (instruction 7). Jolene did not object below to these instructions. Where a party fails to object to given instructions, those instructions become the law of the case and any alleged error will not be considered on appeal. *State v. Parker,* 97 Wn.2d 737, 742, 649 P.2d 637 (1982); *State v. Robinson,* 92 Wn.2d 357, 361, 597 P.2d 892 (1979). However, Jolene argues that the error is of constitutional magnitude, thus compelling our review. She claims the "net effect" of instructions 7, 12, and 14 was to improperly shift the State's burden to prove all the elements of first degree murder beyond a reasonable doubt. Her argument is without merit.

To test the constitutional sufficiency of jury instructions, the reviewing court does not judge the instructions "in artificial isolation, but . . . in the context of the overall charge.'" *State v. Tharp,* 27 Wn. App. 198, 212, 616 P.2d

693 (1980) (quoting *Cupp v. Naughten,* 414 U.S. 141, 146–47, 38 L. Ed. 2d 368, 94 S. Ct. 396 (1973)), *aff'd,* 96 Wn.2d 591, 637 P.2d 961 (1981). The trial court's instructions are proper where they (1) permit each party to argue his or her theory of the case, (2) are not misleading, and (3) when read as a whole, properly inform the trier of fact of the applicable law. *State v. Dana,* 73 Wn.2d 533, 536–37, 439 P.2d 403 (1968); *accord, Seattle v. Gellein,* 48 Wn. App. 341, 343–44, 738 P.2d 1083 (1987). We have reviewed all the trial court's instructions here and find they are constitutionally sufficient. Moreover, juries are presumed, in absence of evidence to the contrary, to have followed the court's instructions in their deliberations. *State v. Corwin,* 32 Wn. App. 493, 495, 649 P.2d 119, *review denied,* 98 Wn.2d 1004 (1982). Jolene's argument that the "net effect" of otherwise proper instructions created an erroneous impression of the law in the jurors' minds is entirely speculative. Accordingly, the trial court did not violate Jolene's constitutional right to a jury trial by giving instructions 7, 12, and 14.

## IV
### IMPEACHMENT BY PRIOR CONVICTION

■ Jolene contends that the trial court erred by prohibiting defense counsel from impeaching Rick with his prior conviction for first degree manslaughter in the shooting death of Chuck. ER 609(a)(1) provides:

> *For the purpose of attacking the credibility* of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross examination but only if the crime . . . was punishable by death or imprisonment in excess of 1 year under the law under which he was convicted, *and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the defendant . . .*

(Italics ours.) The decision to exclude or admit evidence of a prior conviction under ER 609 is within the sound discretion of the trial court. *State v. Burgess,* 43 Wn. App. 253,

266, 716 P.2d 948 (citing *State v. Pam,* 98 Wn.2d 748, 762–63, 659 P.2d 454 (1983)), *review denied,* 106 Wn.2d 1004 (1986).

Here, the trial court, pursuant to ER 609, determined that Rick's prior felony conviction was probative of his credibility. The court's ruling permitted Jolene to admit evidence that Rick was convicted of a felony or, if she preferred, that he had been convicted in the shooting death of Chuck Allen. However, Jolene insisted that she be allowed to admit evidence that Rick has been convicted of first degree manslaughter. The trial court invited defense counsel to provide authority for Jolene's position; however, none was provided below and none is cited on appeal.[3]

The fact that Rick's conviction was for first degree manslaughter bore little on his credibility. *See State v. Moore,* 29 Wn. App. 354, 365, 628 P.2d 522, *review denied,* 96 Wn.2d 1003 (1981). Moreover, Jolene had ample opportunity to impeach Rick with other relevant evidence, namely the numerous inconsistencies between his testimony at Jolene's trial and the testimony at his own trial as well as his statement to the police shortly after he shot Chuck. *See State v. Alexis,* 95 Wn.2d 15, 20, 621 P.2d 1269 (1980). Thus, the trial court did not abuse its discretion by excluding the specific crime for which Rick had been convicted.

## V
### Rebuttal Testimony

Jolene contends that the trial court erred by permitting the State to call a rebuttal witness solely for the purpose of introducing evidence that Jolene had failed the police academy examination. On direct examination, Jolene testified that she had attempted to obtain a concealed weapon because she was interested in becoming a police officer and had received a passing score of 95 on a police academy examination. On cross examination, in an effort to impeach

---

[3]The State incorrectly argued that under ER 609 the trial court could consider the prejudice to the State. However, ER 609 permits consideration only of the "prejudicial effect to the *defendant*". (Italics ours.) ER 609.

her, the State asked Jolene if she had failed the police academy examination. Jolene denied that she had failed and the State called Ruby Harris, personnel analyst for the Public Safety Civil Service Commission, in rebuttal. Ms. Harris testified, over defense counsel's objection, that Jolene had received a failing score on the examination.

Generally, a witness cannot be impeached on matters that are collateral to the principal issues being tried. *State v. Oswalt,* 62 Wn.2d 118, 120, 381 P.2d 617 (1963). In assessing whether a matter is collateral, the reviewing court asks whether "the fact, as to which error is predicated, [could] have been shown in evidence for any purpose independently of the contradiction". *Oswalt,* 62 Wn.2d at 121.

■ However, even where collateral evidence is improperly admitted, the error is only prejudicial if it "affects or presumptively affects the final results of a trial". *State v. Haga,* 8 Wn. App. 481, 492, 507 P.2d 159, *review denied,* 82 Wn.2d 1006 (1973). Here, the admission of the rebuttal testimony, even if collateral, did not affect the verdict. At worst, it undermined Jolene's credibility on a quite neutral matter. Jolene, on the other hand, damaged her own credibility by giving contradictory testimony on a number of matters which related directly to the crime charged. After reviewing the evidence presented at trial, we conclude that the admission of the rebuttal testimony did not affect the verdict.

Affirmed.

COLEMAN, A.C.J., and SCHUMACHER, J. Pro Tem., concur.

Review denied by Supreme Court May 4, 1988.