[No. 29785-6-I.   Division One.   April 26, 1993.]

THE STATE OF WASHINGTON, *Respondent,* v. LINDA LOUISE CRAVEN, *Appellant.*

*Jeffrey Ellis* of *The Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *John L. Belatti, Deputy,* for respondent.

COLEMAN, J. — Linda Craven appeals her conviction for assault in the second degree, contending that the Superior Court erred in permitting certain testimony, in denying her motion to sever counts, and in failing to give a unanimity instruction. We affirm.

Michael Riley has sole custody of his son, Christopher Riley, who was born July 24, 1988. In the summer of 1989, Riley and Christopher moved into Linda Craven's apartment in Redmond, Washington, and in mid-December 1989, Craven assumed responsibility for babysitting Christopher.

In January 1990, when Christopher was 16 months old, Riley was employed as a carpet installer in Tacoma. On

Friday, January 5, Riley received a phone call at work from Craven, who asked if Riley would like to work the next day while she and Christopher visited her mother. Although Craven's request was unusual, Riley arranged to work the next day. When Riley got home that evening, Christopher was in bed and Riley did not see him.

The next morning, Riley entered Christopher's bedroom to say goodbye before he went to work and noticed that Christopher's head was swollen, his eyes were shut, and he was not moving. When Riley asked Craven what happened, Craven stated that Christopher had fallen down the stairs on Friday, that she had taken him to a doctor, and that the doctor had said he was alright.[1] When Riley decided to take Christopher to a hospital, Craven tried to dissuade him. Riley and Craven took Christopher to Evergreen Hospital, and from there he was taken by ambulance to Children's Hospital, where he was admitted and kept for several days.

At Children's, Christopher was examined by Dr. Edgar Marcuse, the attending pediatrician, and Dr. Kenneth Feldman, the medical consultant for child abuse. Both doctors observed multiple injuries of different ages on Christopher. Christopher had an unusual pattern of bruising on his right arm, some bruises being fresh, some being about 3 days old, and some being just under 10 days old. Christopher had two clear loop marks on his back,[2] and there was a strong suggestion that the upper ends of both of Christopher's arm bones had been recently broken. The bruises, loop marks, and arm fractures were not consistent with accidental injury. In addition, Christopher had swelling on the left side of his head and ear, black and blue marks over his right eye, multiple bruises on his back, legs, and arms, fractures of two bones in his skull, two burn marks, a rectal fissure, an ankle abrasion, and a scrape under the nose. Due to the type and

---

[1] It was later learned that Craven had not taken Christopher to a doctor.

[2] These marks were described as being administered by an object such as a phone cord or a rope.

severity of Christopher's injuries, both doctors concluded that the great majority of Christopher's injuries had been inflicted.

As a result, Child Protective Services removed Christopher from Riley's custody for about 6 weeks, and Craven and Riley separated. Approximately 11 months later Linda Craven was charged by information with the crime of assault in the second degree.

When trial began on August 6, 1991, the information was amended to charge two counts of assault in the second degree. As reflected by the "to convict" instructions, count 1 charged Craven with recklessly inflicting the skull fractures, and count 2 charged Craven with recklessly inflicting the other injuries.[3] Craven's motion to sever the charges was denied.

During trial, Riley testified that he noticed changes in Christopher during the 3-week period prior to January 6. He saw bruises on Christopher's arms and legs that he was told had come from falls, and he noticed that Christopher was becoming less active and less responsive and wouldn't cry or play. Riley testified that Craven had been Christopher's sole caretaker during this 3-week period.

---

[3] Instruction 10 provides in part:

"To convict the defendant, Linda L. Craven, of the crime of assault in the second degree, as charged in count 1 (skull fracture), each of the following elements of the crime must be proved beyond a reasonable doubt:

"(1) That during a period of time intervening December 16, 1989, and January 6, 1990, the defendant intentionally assaulted Christopher Riley;

"(2) That by the assault the defendant recklessly inflicted substantial bodily harm on Christopher Riley; and

"(3) That the acts occurred in King County, Washington."

Instruction 11 provides in part:

"To convict the defendant, Linda L. Craven, of the crime of assault in the second degree, as charged in count 2 (other injuries), each of the following elements of the crime must be proved beyond a reasonable doubt:

"(1) That during a period of time intervening December 16, 1989, and January 6, 1990, the defendant intentionally assaulted Christopher Riley;

"(2) That by the assault the defendant recklessly inflicted substantial bodily harm on Christopher Riley; and

"(3) That the acts occurred in King County, Washington."

Drs. Marcuse and Feldman also testified. Both doctors documented the injuries found on Christopher and stated their conclusion that Christopher's injuries were inflicted. Dr. Feldman stated that Christopher had "fingerprint-type injuries", lines of circular marks around his arms and legs which indicated that Christopher had been held too tightly. Dr. Feldman also noted that most of Christopher's injuries were over the soft tissue regions of his body, unlike the normal sites of accidental injury, bony prominences such as elbows and knees.

Diane Wolman, an emergency room social worker at Children's, testified to Craven's explanation of the head injury: that Christopher had fallen down a half flight of stairs, that a neighbor suggested that Craven take Christopher to a clinic, and that she took Christopher to a clinic where they had looked him over, stated that he was fine, and sent him home. Later, Craven admitted to Wolman that she lied about the neighbor and lied about taking Christopher to the clinic.

The prosecutor asked Wolman about Craven's behavior during their conversation, and Wolman stated, "She was having difficulty making eye contact. She wasn't looking at me. She was staring down at the floor a good deal of the time." Defense counsel objected when the prosecutor then asked whether this behavior was something Wolman normally encountered. The court overruled the objection, and Wolman responded that Craven's "behavior was somewhat unusual from what I normally saw. She wasn't crying . . . She seemed sort of withdrawn to me."

At the close of trial, the court denied defense counsel's renewed motion to sever counts 1 and 2, and defense counsel excepted to the trial court's refusal to give a unanimity instruction. The jury returned a verdict of not guilty in count 1 (pertaining to the skull fractures) and returned a verdict of guilty in count 2 (pertaining to the other injuries). Craven appeals.

■ We first decide whether the Superior Court erred in permitting Diane Wolman, a social worker, to testify that Linda Craven's behavior at the hospital was somewhat unusual. Opinion testimony about a defendant's behavior "is admissible if it is prefaced with a proper foundation: personal observations of the defendant's conduct, factually recounted by the witness, that directly and logically support the conclusion." *State v. Day*, 51 Wn. App. 544, 552, 754 P.2d 1021, *review denied*, 111 Wn.2d 1016 (1988). In *Day*, police detectives were permitted to testify that the defendant had shown "very little emotion" when informed of his wife's death and that his reactions were "inappropriate". *Day*, at 552. In *State v. Allen*, 50 Wn. App. 412, 749 P.2d 702, *review denied*, 110 Wn.2d 1024 (1988), a police detective was allowed to testify that the defendant's grief over her husband's death did not appear to be sincere. *Allen*, at 418-19. In *Allen* and *Day*, the officers' opinion testimony was ruled admissible because it was prefaced by and logically based on the officers' factual observations. *Allen*, at 418-19; *Day*, at 552.

Diane Wolman's opinion testimony was preceded by factual observations which logically supported the conclusion that Craven's behavior was unusual. Wolman testified that Craven was having difficulty making eye contact, was staring down at the floor, and seemed highly anxious, and Wolman then stated that Craven's behavior was somewhat unusual from what she normally saw. Wolman's testimony had an appropriate foundation and was not improper.

■ We next consider whether the Superior Court abused its discretion in denying defense counsel's motion to sever counts. To determine whether the Superior Court's refusal to sever requires reversal, an appellate court must balance the prejudicial effect of admitting evidence of multiple offenses against the following prejudice-mitigating factors:

> (1) the strength of the State's evidence on each count, (2) the clarity of defenses as to each count, (3) whether the trial court properly instructed the jury to consider the evidence of

each crime, and (4) the admissibility of evidence of the other crimes.

*State v. Hernandez,* 58 Wn. App. 793, 798, 794 P.2d 1327 (1990) (quoting *State v. Watkins,* 53 Wn. App. 264, 269, 766 P.2d 484 (1989)), *review denied,* 117 Wn.2d 1011 (1991).

All of the prejudice-mitigating factors are present. The court noted that the State's circumstantial evidence was fairly strong on both counts and noted that Craven's defenses to both counts, while not identical, could be clearly understood by the jury. The court instructed the jury to decide each count separately, and the jury demonstrated its ability to follow that instruction by returning a verdict of not guilty on count 1. Finally, the court noted that the injuries which formed the basis for both counts were observed on the same date, implying that evidence of all the injuries would be testified to in separate actions even if the counts were severed. There would simply be no basis to segregate this testimony. Considering these factors, the Superior Court did not err in refusing to sever.

■ Finally, we consider whether the Superior Court erred in refusing to give a unanimity instruction. Under *State v. Petrich,* 101 Wn.2d 566, 572, 683 P.2d 173 (1984), where several distinct criminal acts are alleged but only one count of criminal conduct is charged, "the jury must be unanimous as to which act . . . constitutes the crime." (Footnote omitted.) *State v. Noltie,* 116 Wn.2d 831, 843, 809 P.2d 190 (1991) (citing *State v. Kitchen,* 110 Wn.2d 403, 411, 756 P.2d 105 (1988)). To insure unanimity, the "State may . . . elect the act upon which it will rely for conviction" or the jury may be "instructed that all 12 jurors must agree that the same . . . criminal act has been proved beyond a reasonable doubt". *Petrich,* at 572. However, "where the evidence indicates a 'continuing course of conduct' ", our courts have recognized an exception to the *Petrich* rule.[4] *See State v. Handran,* 113

---

[4]A continuing course of conduct has been found where the defendant inflicted fatal injuries upon a single 3-year-old victim over a 2-hour time period, *State v. Crane,* 116 Wn.2d 315, 330, 804 P.2d 10, *cert. denied,* ___ U.S. ___, 115 L. Ed. 2d

Wn.2d 11, 17, 775 P.2d 453 (1989) (citing *Petrich*, at 571). "To determine whether one continuing offense may be charged, the facts must be evaluated in a commonsense manner." *State v. Gooden*, 51 Wn. App. 615, 618, 754 P.2d 1000 (quoting *Petrich*, at 571), *review denied*, 111 Wn.2d 1012 (1988).

Christopher's injuries strongly indicated that he had been subjected to continuing assaults during the 3-week period prior to January 6. Drs. Marcuse and Feldman were of the firm opinion that the unusual pattern of bruising on Christopher's arms, the loop marks, and the arm fractures were inflicted. Although Drs. Marcuse and Feldman testified that some of Christopher's injuries may have been accidental, the type, number, and severity of Christopher's other injuries also indicated that they had been purposefully caused.[5] The State charged Linda Craven with a single count of assault for the injuries Christopher suffered apart from the skull fractures, and the State presented evidence showing that, except for a 3-hour period on New Year's Eve, Craven had been his sole caretaker during the charging period. The State's evidence, its argument to the jury, and its to-convict instructions all supported the State's theory that Craven had engaged in a systematic pattern of abusive conduct which lends itself to the continuing course exception.

Analogous case law supports the State's theory of the case. Physical and sexual child abuse are not too dissimilar, and

---

1033, 111 S. Ct. 2867 (1991); where the defendant committed two assaults upon his ex-wife during a single burglary, *State v. Handran*, 113 Wn.2d 11, 17, 775 P.2d 453 (1989); where the defendant promoted the prostitution of one minor during a 3-month period, *State v. Barrington*, 52 Wn. App. 478, 482, 761 P.2d 632 (1988), *review denied*, 111 Wn.2d 1033 (1989); and where the defendant promoted the prostitution of two minors during a 10-day period, *State v. Gooden*, 51 Wn. App. 615, 620, 754 P.2d 1000, *review denied*, 111 Wn.2d 1012 (1988).

[5]In concluding that the majority of Christopher's bruises were inflicted, Dr. Feldman stated, "All the other things, multiple injuries, multiple times, multiple body surfaces, location of the injuries, it's the weight of the whole pattern of bruises rather than any individual bruise that makes it." Similarly, Dr. Marcuse stated that, based on "[t]he pattern of bruising, and the multiple bruises of different ages, their shape and their distribution", he was very certain that Christopher's injuries had been inflicted.

child prostitution, a type of child sexual abuse, falls within the continuing course exception to the *Petrich* rule. While the statute which prohibits promoting the prostitution of minors permits charges to be filed for each act of prostitution, the statute also permits a single charge to be filed for a continuous course of conduct.[6] RCW 9A.88.070(1)(b); *see also State v. Gooden*, 51 Wn. App. 615, 618, 754 P.2d 1000, *review denied*, 111 Wn.2d 1012 (1988). In addition, under *State v. Crane*, 116 Wn.2d 315, 330, 804 P.2d 10, *cert. denied*, ___ U.S. ___, 115 L. Ed. 2d 1033, 111 S. Ct. 2867 (1991), the continuing course exception has been extended to assault. *See Crane*, at 330 (fatal assault on 3-year-old over 2-hour period). Although the timeframe involved in *Crane* is narrower than that shown here, the logic remains the same, and *Crane* implicitly recognizes that the continuing course exception can be applied to an assault prosecution in a factually appropriate case. As in *Crane* and *Gooden* we find no error in the Superior Court's failure to give a *Petrich* instruction.[7]

The judgment and sentence of the trial court are affirmed.

PEKELIS, A.C.J., and AGID, J., concur.

Reconsideration denied May 25, 1993.

Review denied at 122 Wn.2d 1019 (1993).

---

[6]*See Barrington*, at 478, 482 (one count charged for promoting the prostitution of one minor during a 3-month period); *Gooden*, at 616, 620 (two counts charged for promoting the prostitution of two minors during a 10-day period).

[7]We note that charging one count of assault for a continuous course of conduct seems particularly appropriate where, as here, the child victim is preverbal, the abusive conduct occurred outside the presence of witnesses, and no one could testify to any single act of abuse. Where evidence of the abuse can only come from a physical examination of the child, from the totality of the injuries, from an observation of the child's demeanor, and from the circumstances surrounding the incident which brings the child to the attention of health care professionals, basing a conviction upon distinct criminal acts is not the only theory upon which to proceed. Indeed, a fact pattern which evidences systematic abuse particularly lends itself to a continuing course of conduct analysis.