IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| THE STATE OF WASHINGTON, | No. 85002-4-I |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| ANTONIO PIERCE GODFREY, | |
| Appellant. | |

BOWMAN, J. — Antonio Pierce Godfrey appeals his jury convictions for domestic violence (DV) second degree rape and DV first degree incest of his daughter. He argues that the trial court denied him his constitutional right to a unanimous jury verdict by failing to give a unanimity instruction. Because Godfrey's actions were a continuing course of conduct, the court did not err, and we affirm his convictions. But we remand for the trial court to strike the $500 victim penalty assessment (VPA) from his judgment and sentence under the recent amendments to RCW 7.68.035.

FACTS

A.G. is Godfrey's biological daughter and one of his seven children. In about 2010, after graduating high school, she moved to Ohio and had limited contact with Godfrey. After a few years, A.G. resumed contact with him. Around 2012, she started returning to Seattle regularly to visit her family and sometimes stayed with Godfrey in his one-room studio apartment. When she stayed with Godfrey, A.G. slept on a raised futon couch "in front of his bed."

A.G. moved back to Seattle in January 2021. She stayed in hotels or with different family members and saw Godfrey for their weekly "dad-daughter day." On June 24, Godfrey and A.G. spent the day together. They bought cannabis at a dispensary, which was common. But they also bought cocaine from one of A.G.'s brothers, which was "unusual." A.G. and Godfrey smoked the cannabis throughout the day. A.G. also took a Benadryl allergy pill early in the afternoon.

That evening, they returned to Godfrey's apartment. A.G. was living with her nephew's mother at the time. But because it was late, she decided to stay the night. Godfrey and A.G. smoked more cannabis and A.G. rubbed cocaine on her gums. They talked and watched movies. A.G. fell asleep on the futon at about 10:30 p.m. When she woke up around 1:00 a.m., Godfrey was "still up." They talked more, listened to music, and smoked cannabis until about 4:00 a.m. A.G. then fell back asleep on the futon, which was covered with a blanket. She was fully clothed in her jeans and T-shirt and covered with a comforter.

About an hour later, A.G. woke to find her shirt and bra "pushed up" and her "breasts completely . . . exposed." Her jeans and underwear were at her ankles and her right leg was completely out of them. Godfrey was naked and "caressing" A.G.'s breasts. He was performing oral sex on her, and A.G. felt like Godfrey had also penally raped her. A.G. screamed, " 'What the [fuck]? Are you serious? . . . What did you do?' " Godfrey, who "was aroused," ran to the kitchen area and repeatedly apologized.

A.G. ran from Godfrey's apartment while putting her clothes back on. She immediately called her oldest brother and told him what happened. Then she

called her nephew's mother to come get her. While she waited, Godfrey called her several times, but she did not answer. He then started texting her. A.G. texted back:

> "How could you do this to me, Dad? I trusted you. I trusted you with my life and you have sex with me in my sleep. I'm your daughter. I feel so disgusted. I just want to go home. I'm never coming back here."

Godfrey replied, " 'I [am] really sorry, I can't lose you, I'm going to end my life. I didn't do nothing.' " A.G. texted, " 'I know what you did, so do you, and you will have to live with this for the rest of your life.' " Godfrey replied, " 'I said I was sorry.' " After waiting about 10 minutes, A.G.'s family member arrived and took her home.

A.G. showered when she got home and decided to call the police about an hour later. The next day, she underwent a sexual assault examination. The nurse swabbed A.G.'s vagina and other parts of her body. The Washington State Patrol Crime Laboratory (WSPCL) then tested the swabs. The swabs of A.G.'s vagina did not detect semen but they showed the presence of Godfrey's DNA.

The State charged Godfrey with one count of second degree rape and one count of first degree incest, both with DV designations. At the time of trial, A.G. was 30 years old. The jury convicted Godfrey as charged. At sentencing, the court imposed 34 months of confinement for the incest conviction and a concurrent, indeterminate sentence of 114 months to life for the rape conviction. The court found Godfrey indigent and waived all discretionary legal financial obligations (LFOs).

Godfrey appeals.

ANALYSIS

Godfrey argues the trial court denied him his constitutional right to a unanimous jury verdict by failing to give a unanimity instruction. He also asserts a recent amendment to the LFO statute requires we strike the $500 VPA from his judgment and sentence.

Unanimity Instruction

Godfrey argues that the trial court violated his right to a unanimous jury verdict because "there were two distinct acts which could have been the basis for the guilty verdicts" and the court did not instruct the jury on unanimity. The State argues that a unanimity instruction was unnecessary because the acts constituted a continuing course of conduct. Whether or not a unanimity instruction was required in a particular case is a question of law we review de novo. State v. Lee, 12 Wn. App. 2d 378, 393, 460 P.3d 701 (2020).

Criminal defendants in Washington have a constitutional right to a unanimous jury verdict under article I, section 21. State v. Smith, 159 Wn.2d 778, 783, 154 P.3d 873 (2007). If the State presents evidence of multiple acts of misconduct that could support conviction of a single count, either the State must elect which act it will rely on for a conviction, or the trial court instructs the jury that it must unanimously agree that the State proved a specific criminal act beyond a reasonable doubt. State v. Coleman, 159 Wn.2d 509, 511-12, 150 P.3d 1126 (2007). But this rule applies only where the State presents evidence of " 'several distinct acts.' " State v. Handran, 113 Wn.2d 11, 17, 775 P.2d 453

(1989)[1] (quoting State v. Petrich, 101 Wn.2d 566, 571, 683 P.2d 173 (1984)).  In cases involving a " 'continuing course of conduct,' " the State need not elect which act proves a conviction, nor does the trial court need to provide a unanimity instruction.  Id. (quoting Petrich, 101 Wn.2d at 571).

In determining whether more than one act amounts to a continuing course of conduct, we consider such facts as the time between the criminal acts and whether they involved the same party, location, and ultimate purpose.  State v. Love, 80 Wn. App. 357, 361, 908 P.2d 395 (1996).  And rather than rely on a steadfast rule, we evaluate these facts in a "commonsense manner."  Handran, 113 Wn.2d at 17.  So, while evidence that the charged conduct occurred at different times and places tends to show that several distinct acts occurred, evidence that a defendant engaged in a series of actions intended to secure the same objective supports a continuous course of conduct.  State v. Fiallo-Lopez, 78 Wn. App. 717, 724, 899 P.2d 1294 (1995).

Lee and Handran are instructive.  In Lee, the defendant Lee strangled the victim K.H. in her living room and kitchen, then chased her to the bedroom where he removed her clothes and penetrated her with his penis.  12 Wn. App. 2d at 384-85.  When he could not stay aroused, Lee penetrated her digitally.  Id. at 385.  We concluded that the acts amounted to a continuing course of conduct because the defendant's "acts of sexual penetration involved the same victim, K.H., occurred in one place, K.H.'s bed, occurred within a brief period of time,

---

[1] Internal quotation marks omitted.

less than 10 minutes, and occurred for the single purpose of Lee's sexual gratification." Id. at 397.

In Handran, the defendant climbed through his sleeping ex-wife's apartment window and kissed her while he was nude. 113 Wn.2d at 12. She told him to leave, but the defendant pinned her down and hit her in the face. Id. The State charged the defendant with one count of first degree burglary but did not elect which assault was the predicate for the charge, and the trial court did not give the jury a unanimity instruction. Id. at 12-13. Our Supreme Court concluded, "Under a commonsense evaluation of these facts, the actions evidence a continuing course of conduct to secure sexual relations with [the victim] . . . rather than several distinct acts." Id. at 17.

Here, A.G. fell asleep at 4:00 a.m. and woke to Godfrey performing oral sex on her around 5:00 a.m. She testified that she believed Godfrey had also penetrated her with his penis. The evidence shows that both acts occurred at nearly the same time, in the same place, with the same victim, and with the single ultimate purpose of Godfrey's sexual gratification. Godfrey's actions amount to a continuing course of conduct.[2]

Godfrey argues that the acts do not amount to a continuing course of conduct because "there is no evidence they occurred within a relatively short time frame like the 5 minutes in Lee or within a few minutes like in Handran." But case law shows there is no minimum amount of time between acts for them to be

---

[2] Second degree rape and first degree incest are separate offenses, but the double jeopardy clause does not prevent convictions—and attendant penalties—for both offenses arising out of a single act of intercourse. State v. Calle, 125 Wn.2d 769, 782, 888 P.2d 155 (1995).

continuous. Indeed, our Supreme Court found a continuing course of conduct when a defendant inflicted several fatal injuries over a 2-hour period on the same victim. State v. Crane, 116 Wn.2d 315, 330, 804 P.2d 10 (1991). In State v. Craven, 69 Wn. App. 581, 588-89, 849 P.2d 681 (1993), the trial court did not err in failing to give a unanimity instruction where the defendant abused the same victim over 3 weeks. And in State v. Marko, 107 Wn. App. 215, 220-21, 27 P.3d 228 (2001), the defendant's threatening statements to different people during a 90-minute time period did not require a unanimity instruction to support a conviction of witness tampering.

Here, a commonsense evaluation of the facts shows Godfrey engaged in a continuing course of conduct. The trial court did not err by failing to instruct the jury on unanimity.[3]

VPA

Godfrey argues we should remand for the trial court to strike the VPA from his judgment and sentence under RCW 7.68.035(4). The State concedes the issue. We accept the State's concession.

Courts may not impose discretionary LFOs on indigent defendants. State v. Ramirez, 191 Wn.2d 732, 747, 426 P.3d 714 (2018). That prohibition applies prospectively when the legislature amends an LFO statute pending appeal. Id. at 749. Here, when the trial court sentenced Godfrey in February 2023, the $500

---

[3] In Godfrey's statement of additional grounds for review, he argues that "no evidence [was] found at the [crime] scene or semen." He also points out that law enforcement did not test the blanket that A.G. slept on during the rape and asks why A.G. "never woke up." But WSPCL found his DNA on the swab of A.G.'s vagina, and she did eventually wake up during the assault. In any event, Godfrey offers no legal argument to support his contentions, so we do not address them. See RAP 10.3(a)(6).

VPA was mandatory under former RCW 7.68.035(1)(a) (2018).  But while Godfrey's appeal was pending, the legislature amended the LFO statute to prohibit imposing a VPA "if the court finds that the defendant, at the time of sentencing, is indigent as defined in RCW 10.01.160(3)."  RCW 7.68.035(4); LAWS OF 2023, ch. 449, § 1 (effective July 1, 2023).  The parties do not dispute that the sentencing court found Godfrey indigent.  Accordingly, we remand for the trial court to strike the $500 VPA from Godfrey's judgment and sentence.

We affirm Godfrey's convictions but remand to strike the VPA.

Bowman, J

WE CONCUR:

Hazelrigg, A.C.J.

Smith, C.J.