FILED
COURT OF APPEALS
DIVISION II

2013 APR 23 PM 12: 01

STATE OF WASHINGTON

BY
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 42227-1-II |
| Respondent, | ) | (consolidated with |
| | ) | No. 42237-9-II |
| v. | ) | and |
| | ) | No. 42247-6-II) |
| KIMLIS TEK, | ) | |
| | ) | UNPUBLISHED OPINION |
| Appellant. | ) | |
| | ) | |

WIGGINS, J.P.T.[1] — Defendant Kimlis Tek appealed his conviction following a jury trial

for offenses arising out of two assaults on his wife and numerous in-person, mail, and telephone

communications prior to trial. Tek was sentenced for assault in the second degree, assault in the

first degree, two counts of witness tampering, and 36 counts of violation of a no-contact order,

all with domestic violence enhancements. We hold that the evidence was sufficient to prove the

requisite intent for assault in the first degree; that the judge did not impermissibly comment on

the evidence; that the witnesses did not offer impermissible lay opinion testimony on an ultimate

issue; that Tek engaged in two separate courses of witness tampering; that the legislature

intended to make each act in contravention of a no-contact order a separate violation under the

statute; and that Tek did not receive ineffective assistance of counsel.

---

[1] Justice Charlie Wiggins is serving as a judge pro tempore of the Court of Appeals, Division II,
pursuant to CAR 21(c).

FACTS

*Incident One, May 28, 2010*

On May 28, 2010, Tek and his wife Andrea[2] had an argument and decided that they did not want to be together any longer. When Andrea began to move Tek's clothes out of the closet and onto the sofa, Tek became upset and retrieved a gun from the bedroom. Mentioning suicide, Tek left the house, and Andrea called the police.

Unsure what Tek was planning to do with the gun, Andrea locked the door. Tek then waved the gun at the window where Andrea was standing. In a 911 call, Andrea told operators that Tek "just pointed the gun at [her]." 3 Report of Proceedings (RP) at 515. Olympia police arrived and took Tek into custody. When Tek was taken into custody, the magazine of his gun was fully loaded, but there was no round in the chamber.

On May 30, Andrea visited Tek in the Thurston County Jail. There, Tek asked Andrea to tell the court that he had not threatened her and to tell the police that "it wasn't a domestic dispute." 3 RP at 472. Tek asked Andrea to go to court, tell the court that he had no prior offenses, and "convince the judge" that they had never gotten into a fight and that he had never threatened her. 3 RP at 473.

Upon his release from jail, Tek moved back in with Andrea, because she still wanted to be with him.

*Incident Two, December 24, 2010*

On December 24, 2010, Andrea attempted to repair the family computer, but rendered it inoperable instead. Tek became upset because he had been using the computer to talk online with his family in Cambodia. Andrea then had some drinks and spoke with her ex-boyfriend on

---

[2] Ms. Tek is hereinafter referred to by her first name to distinguish her from the defendant Tek. No disrespect is intended.

the phone. Following her conversation, Tek confronted Andrea, believing that she intended to get back together with her ex-boyfriend. Andrea then asked Tek to leave. Tek said he would "show" her, then retrieved a knife from the closet, removed it from a sheath, and cut Andrea on the arm. 3 RP at 533-34.

The knife was later found to be a military-style knife, measuring seven and one-half inches in length. The cut was approximately six inches long, passing down her forearm from elbow to wrist. Dr. Lisa Skinner, an emergency room physician, found that the cut had gone through an entire muscle and a portion of another muscle.

When Olympia police arrived, Tek had wrapped Andrea's arm in a towel and appeared to be applying pressure to the wound. He admitted to slashing Andrea on the arm and asked officers to shoot him in the head. During medical observation, Tek stated that:

> I can't believe I just snapped. I didn't mean to hurt her. I never meant to hurt my
> wife. Sometimes that bitch makes me crazy. I tried to stop the bleeding with the
> blue towel. I don't deserve to live for this shit.

1 RP at 159. By the time paramedics transported Andrea to the hospital, she was beginning to pass out. Andrea was treated in the emergency room for a total of eight hours and received 2 sets of stitches and 28 staples, followed by five to six weeks of hand therapy. At the time of trial, she testified that she was "completely healed," albeit with some lingering numbness and a permanent scar. 3 RP at 540. Andrea returned to work as a dental technician within several days of the incident.

On December 27, 2010, the Thurston County Superior Court entered a pretrial no-contact order pursuant to chapter 10.99 RCW. Between then and the beginning of trial, Tek placed at least 40 phone calls from the Thurston County Jail to Andrea. Some of the calls were continuations of the same conversation, because the jail's telephone system automatically

disconnected all calls after 15 minutes. During these calls, Tek and Andrea discussed a variety of subjects, including an incident where Tek's cellmate had his case dismissed because his wife did not attend his trial. Tek asked Andrea to take a vacation and "disappear" during March. 2 RP at 326. He told Andrea that as his wife, she did not have to testify against him. He told Andrea she "should have kept [her] mouth shut. . . ." 2 RP at 335. He then asked Andrea specifically not to show up if he went to trial.

Tek also sent Andrea more than five letters. In these letters, he asked her to "ignore all those lying ass prosecutors," not to give the prosecutors anything to work with, and not to testify against him. 2 RP at 357. Tek's trial began on May 16, 2011.

*The Trial*

In connection with the May 28, 2010 incident, Tek was charged with assault in the second degree with firearm and domestic violence enhancements, in contravention of RCW 9A.36.021(c), 9.94A.825, 9.94A.533(3), and 10.99.020. In connection with the December 24, 2010 incident, Tek was booked on assault in the second degree, but the charge was upgraded to assault in the first degree later that night. Prosecutors charged Tek with assault in the first degree with deadly weapon and domestic violence enhancements, in contravention of RCW 9A.36.011(1)(a), 10.99.020, 9.94A.825, 9.94A.533(4). Prosecutors also charged Tek with two counts of witness tampering with a domestic violence enhancement, in contravention of RCW 9A.72.120(1)(a) and 10.99.020; one charge arose out of the May 30, 2010 visit, and the other from the phone calls and letters between February 9, 2011, and March 28, 2011. Finally, prosecutors charged Tek with 36 counts of violation of a pretrial no-contact order with a domestic violence enhancement, in contravention of RCW 26.50.110(1), 10.99.040(2), 10.99.040(4), and 10.99.020.

At trial, the State introduced a number of photographs, including a photograph of Dr. Skinner examining Andrea's wound (State's exh. 25) and a photograph of the wound itself (State's exh. 27). State's exhibit 25 did not indicate the injury. Before allowing the photographs to be published to the jury, the trial judge admonished the jury that State's exhibit 27 was "somewhat graphic" and that the jurors "may want to look at it quickly or not at all." 1 RP at 57. Counsel did not object.

Olympia police officer Cory Johnson testified that he initially booked Tek for assault in the second degree before changing the charge to assault in the first degree. Similarly, detective Russell Gies testified that he "upgraded" the charge based on "the severity of the injury that [he] had become aware of during the investigation." 2 RP at 247-48. Counsel did not object to either testimony.

The State introduced Tek's letters and the recordings of his phone conversations through detective Gies. Detective Gies testified that Tek was "attempting to both have her change her testimony and/or not show up for a trial and be out of town or not be available during trial." 2 RP at 322. Gies also testified that it was "evident" that Tek's letters were an attempt to influence Andrea's testimony, or deter her from attending trial. Counsel did not object to either statement. 2 RP at 356.

The State introduced recordings of Andrea's custodial visits to Tek through detective Brenda Anderson. Anderson testified that she "believe[d] there was evidence" before counsel objected, and the trial judge sustained the objection. 3 RP at 474. The prosecutor then rephrased her question to ask what Anderson was looking for when she listened to the recordings; Anderson responded "[e]vidence," without objection. *Id.* The prosecutor also asked Anderson

why she booked Tek for witness tampering, to which she testified that there was "evidence to suggest that he was trying to change [Andrea's] story." 3 RP at 481. When the prosecutor asked if there was anything in the recordings "that led [Anderson] to believe that those charges were warranted," counsel objected, but was overruled by the court. *Id.* Anderson then began, "To me, it indicated that there was—", before counsel objected, which was sustained by the trial judge. Anderson then testified that "there was clear evidence to [her] there was tampering"; counsel objected, and the trial judge sustained the objection and struck the testimony. 3 RP at 482.

The jury convicted Tek of all charges, answering yes to each special verdict question (whether Tek and Andrea were members of the same family or household). On the assault in the second degree conviction, Tek was sentenced to 15 to 20 months plus an enhancement of 36 months, based on an offender score of 4 and a seriousness level of IV. On the witness tampering charges, Tek was sentenced to 9 to 12 months, based on an offender score of 3 and a seriousness level of III. On the assault in the first degree, Tek was sentenced to 129 to 171 months with an enhancement of 24 months, based on an offender score of 4 and a seriousness level of XII. On the 36 charges of violation of a no-contact order, Tek was sentenced to 0-365 days.[3] Tek timely appealed his convictions.

ANALYSIS

I.    Sufficient Evidence

To determine whether sufficient evidence exists to sustain a conviction, we determine whether, viewing all evidence in the light most favorable to the prosecution, any rational finder of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Engel*, 166 Wn.2d 572, 576, 210 P.3d 1007 (2009) (citing *State v. Wentz*, 149 Wn.2d 342, 347, 68

---

[3] Violation of a no-contact order is a gross misdemeanor and is not considered under the Sentencing Reform Act of 1981, chapter 9.94A RCW.

P.3d 282 (2003)). Although Tek asserts that insufficient evidence violates his due process rights and should be reviewed de novo, sufficiency of the evidence is nonetheless reviewed by the deferential rational-trier-of-fact standard. *In re Pers. Restraint of Martinez*, 171 Wn.2d 354, 364, 256 P.3d 277 (2011). To do so, the court will first examine the contested elements of the crime, followed by an examination of the evidence used to sustain that crime taken in a light most favorable to the prosecution.

Assault in the first degree requires that the defendant assault another person with a deadly weapon or with any force or means likely to produce great bodily harm and that the defendant intends to inflict great bodily harm. RCW 9A.36.011. Tek contests whether sufficient evidence exists to suggest that he "intend[ed] to inflict great bodily harm." *See id.* Intent may be inferred from the defendant's conduct. *See State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). For example, in an assault case, evidence of intent includes the manner and act of inflicting the wound, the nature of the prior relationship, and any previous threats. *See State v. Mitchell*, 65 Wn.2d 373, 374, 397 P.2d 417 (1964). Similarly, applying a predecessor statute of RCW 9A.36.11, Division One of the Court of Appeals held that testimony of a prior altercation, testimony of the defendant shooting through an open window without provocation, and physical evidence that the shot would have hit the victim's head if he had not ducked constituted sufficient evidence to find intent to kill. *State v. Woo Won Choi*, 55 Wn. App. 895, 906, 781 P.2d 505 (1989), *superseded on other grounds as recognized in State v. Anderson*, 72 Wn. App. 453, 458-59, 864 P.2d 1001 (1994).[4]

In the present case, evidence demonstrates Tek's intent in four ways. First, there was

---

[4] Since the events of *Woo Won Choi*, 55 Wn. App. 895, the legislature has changed the intent requirement for assault in the first degree from intent to kill to intent to cause great bodily harm. LAWS OF 1986, ch. 257, § 9.

evidence of a prior altercation where Tek pointed a gun at Andrea. Second, there was no evidence to suggest that Andrea did anything to provoke Tek into attacking. Third, intent is demonstrated by Tek's affirmative conduct when (a) he said he would "show" Andrea, suggesting an impending violent act and (b) because Tek had to walk to the closet, retrieve the knife from beneath some clothes, walk back to Andrea, and unsheathe the knife before he could attack Andrea, suggesting that his actions were not done on impulse. 3 RP at 533-34. And fourth, testimony from Officer Jordan suggested that Andrea's injury was a defensive wound.

Taking these facts in a light most favorable to the prosecution, a rational finder of fact would be justified in finding beyond a reasonable doubt that Tek intended to cause Andrea great bodily harm.

## II. Judicial Comment

Washington Constitution article IV, section 16, forbids the trial judge from conveying to the jury any personal opinion regarding the credibility, weight, or sufficiency of evidence. A judge's opinion may be conveyed directly or by implication, based on the particular facts and circumstances of the case. *State v. Jacobsen*, 78 Wn.2d 491, 495, 477 P.2d 1 (1970). Any remark by the court that has the potential effect of suggesting that the jury need not consider an element of an offense could qualify as a judicial comment on the evidence. *State v. Hartzell*, 156 Wn. App. 918, 936-37, 237 P.3d 928 (2010). Here, the judge did not improperly comment on the evidence, and any statement did not prejudice the defendant.

The judge's statements were not improper because they did not go to the credibility, weight, sufficiency, or materiality of a piece of evidence. Gruesome photographs, like other evidence, are admissible if their probative value outweighs their prejudicial effect. *State v. Hoffman*, 116 Wn.2d 51, 88, 804 P.2d 577 (1991); *State v. Harris*, 106 Wn.2d 784, 791, 725 P.2d 975 (1986). The trial judge's statement to the jury that photographs of the victim's injury were

8

"somewhat graphic" and that the jurors "may want to look at it quickly or not at all" did not rise to the level of an impermissible comment. This did not indicate that the photo was more or less important or probative, rather only that it was potentially disturbing to observe. Whether the injury was disturbing when looking at photos was not an issue at trial. It is tenuous to suggest that from the judge's statement the jury could infer that Tek acted with intent to cause great bodily harm. It is more likely that the judge—like most people—was cautious of others' sensitivity to blood and exposed tissue.

Furthermore, the judge's statements did not prejudice the defendant. When the court determines that the trial judge commented on the evidence, then prejudice is presumed. *Levy*, 156 Wn.2d at 723. However, that presumption is defeated if "overwhelming untainted evidence" supports the conviction. *State v. Lane*, 125 Wn.2d 825, 840, 889 P.2d 929 (1995). Here, the untainted evidence supporting a finding of intent to cause great bodily harm is enough to preclude the possibility that the trial judge's statement influenced the jury. Andrea testified about the treatment and therapy that she needed after the attack, the permanent scarring she suffered, and commented that the "whole top portion [of her arm] was just kind of open. . . ." 3 RP at 538. Emergency personnel corroborated her testimony: Firefighter and emergency medical technician (EMT) Brandon Sivonen, Dr. Skinner, and Tiffany Grauman, an emergency room nurse, all testified to the nature of the wound. Without ever seeing State's exhibit 27, the jury could have determined that Andrea's injury was too severe to have been inflicted without intent to cause great bodily harm. Even if the judge improperly commented on the State's exhibit 27, Tek was not prejudiced.

III.   Opinion Testimony

According to ER 701, a nonexpert witness may only testify to opinions that are rationally based on that witness's factual perceptions. Although Tek admits that counsel failed to object to

9

the statements at trial, he asserts a right to raise them for the first time on appeal if he can demonstrate that these questions are of "manifest" constitutional magnitude. RAP 2.5(a)(3). RAP 2.5(a)(3) is a "narrow" exception that requires a showing of "actual prejudice" or "'practical and identifiable consequences.'" *State v. Kirkman*, 159 Wn.2d 918, 934-35, 155 P.3d 125 (2007) (quoting *State v. WWJ Corp.*, 138 Wn.2d 595, 603, 980 P.2d 1257 (1999) (internal quotation marks omitted)). For that reason, we require that the challenged statement be "explicit or almost explicit" on an ultimate issue of fact.[5] *Id.* at 936.

### A. Opinion Testimony on Assault in the First Degree

Detective Gies testified that Tek's original charge of assault in the second degree was upgraded to assault in the first degree based on the severity of the injury, which the detective became aware of during the investigation. He did so in rebuttal to defense counsel's questioning about the arresting officer's choice of booking charge. It was not improper opinion testimony for detective Gies to explain why he charged Tek with the crime being tried. *See State v. Sutherby*, 138 Wn. App. 609, 617, 158 P.3d 91 (2007), *aff'd in part and reversed in part*, 165 Wn.2d 870, 204 P.3d 916 (2009) ("In some instances, a witness who testifies to his belief that the defendant is guilty is merely stating the obvious, such as when a police officer testifies that he arrested the defendant because he had probable cause to believe he committed the offense."). Detective Gies's testimony demonstrated that he had probable cause sufficient to book Tek for assault in the first degree. This is a fact necessarily implied by the fact that Tek is being tried for that crime. As such, Detective Gies's testimony told the jury nothing they did not already know from

---

[5] Tek argues, relying on *King*, that an explicit or nearly explicit opinion on an ultimate issue mandates reversal. *State v. King*, 167 Wn.2d 324, 219 P.3d 642 (2009). This is not the holding of *King*, which held that such an opinion "can" constitute manifest error. *Id.* at 329-30. That is, just because the challenged testimony is explicit does not relieve the defendant of the burden to prove prejudice.

their mere presence in the courtroom. Detective Gies did not improperly testify and his statements do not show prejudice or explicitly raise an issue of fact.

### B. Opinion Testimony on Witness Tampering

Detective Gies also testified that it was "evident" that Tek called Andrea to have her change her testimony or discourage her from attending trial and that the letters contained an attempt to influence Andrea's testimony or discourage her from showing up. 2 RP at 322, 356. Detective Anderson then went on to explain to the court that in recordings of Tek's custodial visits, she looked for "evidence to suggest tampering with the witness" and that "there was evidence to suggest that [Tek] was trying to change her story." 3 RP at 474, 481. However, her testimony that "there was clear evidence to [her] there was tampering" was struck upon objection by counsel. 3 RP at 482.

Opinion testimony does not invade the province of the jury if the jurors are in a position to independently assess the foundational evidence backing that opinion. *City of Seattle v. Heatley*, 70 Wn. App. 573, 581, 854 P.2d 658 (1993). For example, in *Heatley*, an officer's testimony that "[he] determined that Mr. Heatley was obviously intoxicated" was not improper because it was "'directly and logically'" supported by his observations that the defendant's eyes were bloodshot and watery, his face was flushed, his balance was unsteady, he had a strong odor of alcohol, and he swayed significantly during the administration of field sobriety tests. *Id.* at 576-79 (quoting *State v. Allen*, 50 Wn. App. 412, 417 n.1, 749 P.2d 702 (1988)).

As in *Heatley*, the detectives' statements are directly and logically supported by their observations as well as by Tek's recorded statements presented to the jury. The jurors heard the same recordings and read the same letters that Gies and Anderson relied on and were in a position to independently assess the foundational evidence backing the detectives' opinions. In letters, Tek asked Andrea to "ignore all those lying ass prosecutors," and wrote "[p]lease don't

11

testify against me like the DA wants you to." 2 RP at 357, 359. In phone calls, Tek asked Andrea to "[j]ust disappear" and not to show up in March. 2 RP at 326. He told her that she didn't have to testify against him. He said she "should have kept [her] mouth shut" and wished she "would just stop saying anything, man." 2 RP at 335, 339. He asked her not to work with "that other person, the devil, you know who, . . . trying to screw me over." 2 RP at 337. He told her not to show up at his trial, reminding her, "[n]o face, no case." 2 RP at 352. During a custodial visit, he asked her to say that "the whole thing [referring to Tek brandishing the gun during the May 28 incident] was being depressed" and that he had not threatened her. 3 RP at 472. He asked her to tell the police there had been no domestic dispute and to "convince the judge" that the couple never got in a fight. 3 RP at 472-73. Tek's recorded communications speak for themselves; in several instances, he explicitly told Andrea not to come to trial or explicitly coached her on what to testify. The detectives said nothing that the jury could not have deduced for itself upon hearing Tek's own words. Therefore, the testimony was not improper.

IV.    Double Jeopardy

Tek alleges that being charged with 2 counts of witness tampering and 36 counts of a no-contact order violation, impinged on his right to be free from double jeopardy. WASH. CONST. art. I, § 9; UNITED STATES CONST. amends. 5, 14. A double jeopardy analysis necessarily depends on what "'unit of prosecution'" the legislature intended as the punishable act under the statute. *State v. Westling*, 145 Wn.2d 607, 610, 40 P.3d 669 (2002) (quoting *In re Pers. Restraint of Davis*, 142 Wn.2d 165, 12 P.3d 603 (2000)). First, witness tampering at the time of Tek's conduct was controlled by *State v. Hall*, which treats a unit of prosecution more broadly than the statute's current definition. *State v. Hall*, 168 Wn.2d 726, 230 P.3d 1048 (2010) (the court held that Hall committed one crime of witness tampering); *see* RCW 9A.72.110, 9A.72.120 (a "unit of prosecution" for witness tampering is "each instance" of tampering). Second, an individual

violation of a no-contact order, statutorily and under case law, constitutes as a single "unit of prosecution." *See* RCW 26.50.110; *State v. Brown*, 159 Wn. App. 1, 10, 248 P.3d 518 (2010) (the trial court held that multiple violations of a no-contact order resulted in five violations because they were separate contacts occurring on separate days).

### A. Witness Tampering

In *Hall*, the defendant was jailed pending trial for a first degree burglary and second degree assault conviction. 168 Wn.2d at 729. In jail, he attempted to call his girlfriend over 1,200 times, and attempted to persuade her not to testify or to testify falsely. *Id*. Hall was charged with four counts of witness tampering, based on calls placed on March 22, March 30, and April 4. *Id.* He was convicted of three counts and appealed to the Supreme Court, which held that the unit of prosecution was an entire "course of conduct." *Id.* at 731. In other words, the statute was meant to criminalize the attempt to "induce a witness," and the number of specific acts undertaken to further that criminal goal was irrelevant. *Id.*

However, *Hall* by its own terms did not reach those situations where

> additional attempts to induce are interrupted by a substantial period of time, employ new and different methods of communications, involve intermediaries, or other facts that may demonstrate a different course of conduct.

*Id.* at 737-38. This is just such a case. Nearly a year passed between the custodial visit that gave rise to the first tampering charge and the "course of conduct" of letters and phone calls that gave rise to the second tampering charge. 1 RP at 26. Furthermore, Tek committed a new crime (the first degree assault) between the first and the second tampering. Tek had ample time and reason to form a new criminal intent for the second witness tampering. For that reason, two counts of witness tampering were proper.

### B. *Violation of No-Contact Order*

Unlike witness tampering, the statute governing no-contact orders is not governed by *Hall*. The court in *Hall* stated that the result might be different if the statute specified "an attempt" or "any attempt." 168 Wn.2d at 733. This is exactly the case here, where the statute criminalizes "a violation" of a no-contact order. RCW 26.50.110. Here, the State elected to charge 36 counts of violation of a no-contact order. Tek argues that he should have been charged with only 12, because many of the calls were merely continuations of the same conversation after being automatically cut off by the jail phone system.

Division One of the Court of Appeals has held that the unit of prosecution for violation of a no-contact order, RCW 26.50.110, is "a violation," meaning one. *State v. Brown*, 159 Wn. App. 1, 10, 248 P.3d 518 (2010).[6] As Division One correctly noted, the Supreme Court held in *State v. Ose*, 156 Wn.2d 140, 147, 124 P.3d 635 (2005), that the use of the word "a" in criminal statutes usually indicates authorization of punishment for each individual instance of criminal conduct. RCW 26.50.110 criminalizes "a violation" of a no-contact order, meaning an act in contravention of that order. An offense is consummated when the defendant does something to contact the subject of the restraining order, not when a conversation is actually initiated. *State v. Allen*, 150 Wn. App. 300, 313-14, 207 P.3d 483 (2009) (holding that RCW 26.50.110 was violated twice when the defendant sent two e-mails to the subject of a no-contact order, even if she read both e-mails at the same time). In other words, the victim's state of mind is irrelevant; the statute is

---

[6] *State v. Brown* also conducts a separate, further analysis of whether evidence of multiple offenses constitutes a "continuous course of conduct" for the purposes of addressing a jury unanimity requirement. *Brown*, 159 Wn. App. at 13-15 (holding that the defendant's actions constituted a continuous course of conduct and thus the trial court did not err in failing to require a jury unanimity instruction when the prosecution charged five violations of a no-contact order and there was evidence of, at a minimum, 37 acts). Tek does not argue that his actions constitute a continuous course of conduct, but only challenges them under a unit of prosecution analysis.

keyed purely to an action undertaken by the defendant. Where Tek and Andrea understood one conversation to stop and another to begin is no more relevant than when the victim in *Allen* read the e-mails.

A faithful application of *Allen* requires us to hold that a lengthy message broken up into several messages by the carrier constitutes separate violations of RCW 26.50.110. Tek had to make the affirmative act of picking up the phone and dialing anew each time he was dropped by the jail carrier. In each of the 36 instances in which he was charged with violating the no-contact order, he made an affirmative act to get in contact with Andrea—precisely the conduct targeted by RCW 26.50.110. The 36 counts of violation of a no-contact order did not violate double jeopardy protections.[7]

V.    Ineffective Assistance of Counsel

We employ a two-part test for determining whether a defendant has received ineffective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 689, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995).

First, counsel's performance must have been deficient, meaning that, after examining the entire record below, counsel's competency must have fallen below an objective standard of reasonableness based on all the circumstances. *State v. White*, 81 Wn.2d 223, 225, 500 P.2d 1242 (1972). We presume counsel was effective, and require the defendant to show there was no legitimate strategic or tactical reason for the challenged conduct. *McFarland*, 127 Wn.2d at 336.

---

[7] In addition, as misdemeanors, the counts of violation of a no-contact order were not counted into Tek's offender score under the Sentencing Reform Act. Whether he was charged with 36 counts, 12 counts, or 0 counts of violation of a no-contact order would have made no difference to his sentence.

Second, counsel's deficient performance must have prejudiced the defendant. *Strickland*, 466

U.S. at 687.

Tek's counsel was not deficient in not objecting to the putative opinion testimony of detectives Grier and Anderson because there are legitimate tactical reasons not to object too frequently, such as the risk of antagonizing the jury or drawing too much attention to the content of the letters, recordings, and calls themselves. Viewing the record as a whole, counsel was alert and objected where appropriate, such as his timely objection to Detective Anderson's testimony that "there was clear evidence to [her] there was tampering," and counsel's successful exclusion (in voir dire) of Officer Jordan's testimony that Andrea's wound probably resulted from a purposeful attack aimed at the neck area. There is no indication that counsel was anything less than diligent and competent in managing Tek's trial as a whole.

Even if counsel was deficient in not excluding the putative opinion testimony of Grier and Anderson, this testimony was not outcome-determinative. As discussed *supra*, because Tek's recorded communications spoke for themselves, whether their testimony was admitted or not would have made no difference in the outcome of the case. Tek did not demonstrate prejudice and is not entitled to relief based on ineffective assistance of counsel.

## CONCLUSION

We affirm Tek's conviction. Sufficient evidence exists to affirm Tek's conviction of assault in the first degree; the judge's statement on the evidence does not constitute an impermissible comment on the evidence; the nonexpert's statements are not impermissible opinion; Tek's convictions of several counts of witness tampering and violations of a no-contact order do not constitute double jeopardy; and Tek did not receive ineffective assistance of

16

No. 42227-1-II
(Cons. With No. 42237-9-II and No. 42247-6-II)

counsel.

Affirmed.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_Wiggins, JPT_
WIGGINS, J.P.T.

We concur:

_Johanson, A.C.J._
JOHANSON, A.C.J.

_Bridgewater JPT_
BRIDGEWATER, J.P.T.

17