IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON, )
                      )    No. 71531-3-I
          Respondent, )
                      )    DIVISION ONE
      v.                 )
                      )    UNPUBLISHED OPINION
AUSTIN TYRONNE STEIN, )
                      )
          Appellant. )    FILED: March 21, 2016

TRICKEY, J. — Witnesses may not offer opinions on the guilt of a criminal defendant. Here, two police officers testified that Austin Stein was not acting like a victim. Admitting those opinions was error because Stein claimed to act in self-defense. But this error was harmless beyond a reasonable doubt because of the overwhelming untainted evidence of Stein's guilt. Holding that Stein's other challenges fail as well, we affirm.

FACTS

On November 3, 2012, Austin Stein accompanied Anthony Hedin to visit Bill Smith, who lived in a small trailer. It was a Saturday night, and Stein and Hedin joined Smith and his girlfriend Katarina Krogness for a few drinks. At some point, Stein made a comment to Krogness that Smith interpreted as flirtatious or inappropriate. Smith yelled at Stein, accused him of trying to "get at [his] girl," called him a "n[*****]," and told Stein to leave.[1] Stein and Hedin left the trailer and started walking away. Smith came out of the trailer, waiving a hammer above his head, swore at them, and told them to get off his property. They walked back to

---

[1] Report of Proceedings (RP) (Nov. 19, 2013) at 126-27.

Hedin's house. The next morning, Smith called Hedin to apologize for his anger the night before. Smith invited Hedin to come over.

Smith's trailer was in Thomas Cummings and Jacquline Mead's backyard. As Cummings entered his house on November 4, the day after Smith and Stein's altercation, he noticed someone knocking on the windows at the back of the house. He went outside and found Stein, whom he had never met before. Stein was mumbling and hard to understand.

At some point, as they were sitting in front of Cummings' house, Stein mentioned being in a fight with Smith. Cummings later realized Stein was describing the fight from the night before. He observed what he thought might be blood on Stein's shirt. Shortly after, a neighbor approached and suggested that Cummings check on Smith. Cummings entered Smith's trailer and found Smith's blood-covered body. He called 911 and had his neighbor and Mead detain Stein until the police arrived.

When the police arrived, they arrested Stein. The State charged Stein with murder in the second degree, committed while attempting assault in the second degree.

At trial, the medical examiner testified about the extent of Smith's injuries. Smith had injuries to his torso and arms that were consistent with, but not conclusively, defensive wounds. The blows to Smith's chest were made with enough force to break Smith's ribs and bruise his lungs. There were several lacerations on Smith's face, around both eyebrows and into the soft tissue of his ear. There had been at least three blows to the side and back of Smith's head,

2

separate from those that caused the injuries to his face. The blows to Smith's head broke his skull nearly in half. The medical examiner determined that these blows were the cause of death. But the medical examiner could not determine the timing of any of these blows, or whether the fatal injury was caused by just one blow or by the combination of blows.

Detective Jeanne Walford photographed Stein's face and body back at the police station and saw no injuries. At the time of Smith's death, Stein was 26 years old and weighed 230 pounds. Smith was 5 feet 9 inches tall and weighed approximately 150 pounds.

A forensic expert analyzed the blood splatters within the trailer. Noting that the blood splatters were low to the ground, including on the underside of a short table, she concluded that the blood-letting incident had occurred on the ground or very low to the ground. Therefore, Smith was likely on the ground, or very low to the ground, during most of the blows.

Stein claimed he acted in self-defense. He testified about his interaction with Smith that afternoon. Realizing he had an hour to wait for his next bus, Stein said he went over to Smith's to reconcile. The two were drinking and talking about football when Smith went outside to take a phone call. Smith was muttering to himself as he came back inside.

Stein asked Smith if he was all right, and Smith started swearing at him. When Stein stood up, Smith punched him in the head. Smith continued to swing at Stein, causing Stein to fall over. At some point, Smith told Stein, "I'm going to

blow your f[***]ing head off, you n[*****]."[2] Believing that Smith was going to get a gun, Stein tried to stop him and both men fell to the ground. Stein's memory of the fight is hazy, but, eventually, he saw blood and stopped fighting. Stein did not believe there was an opportunity for him to run away during the fight.

A jury convicted Stein of murder in the second degree. He appeals.

## ANALYSIS

### Opinions on Guilt

Stein argues that the trial court erred by allowing the State's witnesses to invade the province of the jury. Specifically, he claims that the police officers' opinions that he was not acting like a victim in the aftermath of his violent confrontation with Smith were improper opinions on guilt. We hold that it was error to admit the testimony in question, but that the error was harmless beyond a reasonable doubt.

A criminal defendant's constitutional right to a jury trial includes the right to have the jury determine the facts. State v. Demery, 144 Wn.2d 753, 759, 30 P.3d 1278 (2001). Therefore, although witnesses may offer opinions that embrace an ultimate issue, they may not state personal opinions of a defendant's guilt directly or by inference. ER 704; State v. Black, 109 Wn.2d 336, 348, 745 P.2d 12 (1987). To determine whether testimony on an ultimate issue constitutes an improper opinion on guilt, we examine "'(1) the type of witness involved, (2) the specific nature of the testimony, (3) the nature of the charges, (4) the type of defense, and (5) the other evidence before the trier of fact.'" State v. Montgomery, 163 Wn.2d

---

[2] RP (Nov. 19, 2013) at 144.

577, 591, 183 P.3d 267 (2008) (internal quotation marks omitted) (quoting Demery, 144 Wn.2d at 759). Because police officers, like the prosecution, represent the State, their opinions are "especially likely" to influence the jury. Demery, 144 Wn.2d at 762.

Here, Detective Walford and Deputy Eric Gagnon, who both have had experience with trauma victims, testified about their interaction with Stein during his arrest. At trial, the State asked Deputy Gagnon to describe his experiences with victims of violent crime:

> [Prosecutor]: And can you tell us, please, what has been your experience with them? Is there a standard response that they all have? Are they all different? Is there a -- a -- a -- common thread that you see among these people?
>
> . . . .
>
> [Deputy Gagnon]: Normally when somebody is – has just been involved in a trauma, let's say a family member has passed away or they have been a victim of a horrendous crime, they're looking for help. They want -- and just because of our societ [sic] -- our cultural and our society, they look --
>
> [Defense]: I'm going to object.
>
> [Deputy Gagnon]: -- people --
>
> [The Court]: Overruled.
>
> [Deputy Gagnon]: They look for people who represent help. Nurses, police officers, fire fighters and so on and so forth. They really have a difficult time making decisions that help them in the immediate sense, meaning they're kind of -- they're in a -- they are in a state where they are, you know, almost locked and that's why they're looking for somebody to help them through that immediate circumstance.[3]

After Deputy Gagnon described his interactions with Stein that night, the

---

[3] RP (Nov. 12, 2013) at 197-98.

State asked him to compare his experience with trauma victims to his encounter with Stein:

> [Prosecutor]: Was there anything about your interactions with him that reminded you of your interactions with people who have been victims of traumatic crime?
>
> [Deputy Gagnon]: They're -- they're not consistent with each other. He was acting [the] opposite of what I have experience in from trauma victims.[4]

The State played Detective Walford's videotaped deposition testimony at trial. Detective Walford described her experience with "thousands" of trauma victims.[5] The State asked her the following question:

> [Prosecutor]: In your experience, was there anything about what he was doing that was consistent with what you've seen from others who have been victims or witnesses of violent or traumatic crimes?
>
> . . . .
>
> [Detective Walford]: Well, he didn't act like a victim.[6]

Under the Montgomery factors, both of these opinions were improper. Both witnesses were police officers, whose testimony might carry extra weight with the jury. The officers went beyond describing Stein's demeanor or behavior. They specifically stated he was not acting like a victim. Because Stein's defense was that he acted in self-defense, these were indirect comments on Stein's guilt. If Stein was not a victim, he was guilty.

Stein's claim to be a victim was critical in this case. No third parties witnessed the encounter between Smith and Stein that night. Stein had no

---

[4] RP (Nov. 12, 2013) at 200.
[5] Clerk's Papers (CP) at 250-51.
[6] CP at 253.

physical evidence to corroborate his self-defense claim. Although the court did not address the propriety of referring to Stein as a victim, its order in limine, that no one should refer to *Smith* as the victim in this case, underscores the importance attached to the label "victim."[7]

The State cites several cases where courts have allowed opinion testimony about a defendant's behavior or demeanor if the testimony is directly and logically supported by personal observations. In State v. Day, the court approved police officers' opinions that the defendant's "reaction was 'inappropriate,' [which] were logically based on their observations that [the defendant] had shown 'very little emotion,' . . . and that he did not ask questions the officers expected." 51 Wn. App. 544, 552, 754 P.2d 1021 (1988). In State v. Allen, a detective was allowed to testify that he believed the defendant's grief was insincere based on her "'facial expression, the lack of tears, [and] the lack of any redness in her face.'" 50 Wn. App. 412, 418-19, 749 P.2d 702 (1988). Similarly, in State v. Craven, an emergency room social worker was allowed to offer her opinion that the defendant's behavior was unusual, which was based on the defendant's inability to make eye contact, lack of crying, and appearing withdrawn. 69 Wn. App. 581, 585-86, 849 P.2d 681 (1993).

But, in each of those cases, the jury could believe the witness but still find the defendant not guilty. Having an inappropriate reaction to the death or injury of a loved one, while damaging to the defense, does not necessarily lead to a finding of guilt. Here, the officers' opinions, if believed, could mean only that Stein was

---

[7] RP (Oct. 30, 2013) at 42; CP at 30.

7

guilty. As mentioned above, Stein did not deny killing Smith – his only defense was that Smith initiated the attack. Therefore, if Stein was not a victim, he was guilty.

The State also cites State v. Crenshaw, which is more factually similar but is also distinguishable. 27 Wn. App. 326, 332, 617 P.2d 1041 (1980). There, the defendant argued not guilty by reason of insanity, but the trial court allowed a witness to opine that the defendant "'seemed very normal'" when he borrowed an ax from her during the middle of his violent attack. Crenshaw, 27 Wn. App. at 332. In that case, the defense objected to the foundation of her testimony, not that it was an improper opinion on guilt.

State v. Aguirre is instructive. 168 Wn.2d 350, 356, 359-60, 229 P.3d 669 (2010). There, a police officer testified about her interview with an alleged victim of domestic violence. Aguirre, 168 Wn.2d at 359-61. The defendant argued that the officer, who described the "general demeanor of victims of sexual assault and domestic violence" and then described the demeanor of the alleged victim, gave an impermissible opinion on guilt. Aguirre, 168 Wn.2d at 356, 359-60. The Supreme Court disagreed based on the fact that the officer "limited her testimony to objective observations of the victim during their interview as compared to other victims whom [she] had interviewed during her lengthy criminal justice career" and "refrained from stating or implying that the victim had been a victim of domestic violence." Aguirre, 168 Wn.2d at 360. Thus, the officer's "testimony was likely helpful to the jury in evaluating for themselves" whether the crime had occurred. Aguirre, 168 Wn.2d at 360.

Here, the officers did not limit their testimony to descriptions of trauma victims and descriptions of Stein's behavior. Rather, the witnesses expressly testified that Stein was "acting [the] opposite of what [Deputy Gagnon had] experience in from trauma victims" and that Stein "didn't act like a victim."[8] The officers' testimony crossed the line drawn by Aguirre.

The State also argues that the opinion testimony from Deputy Gagnon and Detective Walford was proper because it was necessary to rebut Stein's expert witness's testimony. We reject this argument because the police officers' testimony encompassed subjects that the expert was prohibited from addressing and, regardless, the State was able to effectively rebut Stein's expert's testimony during cross-examination.

Stein presented an expert who testified that Stein's uncooperative behavior during the arrest, and his failure to tell the police at that time that he had acted in self-defense, could have been because he was suffering from acute stress after the incident with Smith, a fairly common response to trauma. The expert was not permitted to say that Stein's behavior was consistent with self-defense, and never testified that Stein had been a *victim*. During cross-examination, the expert agreed "that people who kill in anger frequently suffer from stress reaction[s]" and that Stein's stress could have been in response to killing Smith, rather than a response to defending himself from Smith's attack.[9]

The admission of improper opinion testimony invades the province of the jury and is thus constitutional error. State v. Quaale, 182 Wn.2d 191, 201-202,

---

[8] RP (Nov. 12, 2013) at 200; CP at 253.
[9] RP (Nov. 19, 2013) at 56-57.

9

340 P.3d 213 (2014). "A constitutional error is harmless if the appellate court is assured beyond a reasonable doubt that the jury verdict cannot be attributed to the error." State v. Lui, 179 Wn.2d 457, 495, 315 P.3d 493 (2014), cert. denied, 134 S. Ct. 2842, 189 L. Ed. 2d 810 (2014). We will uphold the verdict if the untainted evidence is so overwhelming that it "necessarily leads to a finding of guilt." State v. Anderson, 171 Wn.2d 764, 770, 254 P.3d 815 (2011).

Here, the use of the word "victim" contributed little to the officers' testimony. The officers' permissible testimony about Stein's demeanor, that he was manipulative, evasive, and uncooperative, strongly suggests that Stein was not behaving like the victims the police were used to encountering. Further, the court's jury instruction limited the impact of the officers' testimony:

> A witness who has special training, education, or experience may be allowed to express an opinion in addition to giving testimony as to facts.
> You are not, however, required to accept his or her opinion. To determine the credibility and weight to be given to this type of evidence, you may consider, among other things, the education, training, experience, knowledge, and ability of the witness. You may also consider the reasons given for the opinion and the sources of his or her information, as well as considering the factors already given to you for evaluating the testimony of any other witness.[10]

This instruction lessens the chance that the verdict was attributable to those opinions.

The officers' comments that Stein was a victim might have impacted Stein's credibility, but the jury heard other, untainted, evidence that would also have negatively impacted Stein's credibility. Stein did not tell any of the civilians or police officers he spoke to on the night of Smith's death that he had killed Smith in

---

[10] CP at 124.

self-defense. Cummings testified that Stein first explained the blood on his shirt by saying that he had been in a fight with Hedin in the woods behind a Safeway store. Stein told Cummings' neighbor that he had stopped in front of the house because he saw all the people and thought there was a party. He told police that he was in the area because he had gone to smoke marijuana at someone's house. Stein also told the police that Smith was upright and uninjured when he left the trailer.

Moreover, the physical evidence did not corroborate Stein's version of events. Stein claimed that Smith punched him with so much force that he fell against the side of the trailer. He described himself as fending off Smith's blows, and both men fighting on the ground. Yet, Stein had no scratches, bruises, or other injuries. Stein testified that Smith threatened to shoot him. No gun was found in the trailer. There is no evidence that Smith owned a gun.

Even assuming that Stein believed that Smith had a gun somewhere in the trailer and would shoot him, Stein's use of force was unreasonable. Stein was much younger than Smith and outweighed him by about 80 pounds. But Stein claims that Smith was able to get up and resume swinging at Stein when Stein was "just trying to hold on to him so he [couldn't] move."[11] Stein testified that he did not feel he had an opportunity to run, but he did not testify that he stopped beating Smith as soon as the danger passed. At some point, Stein saw blood and "just stopped."[12] By that time, Stein had broken Smith's ribs with enough force to bruise the lungs, caused lacerations all over Smith's face, and hit Smith in the head at

---

[11] RP (Nov. 19, 2013) at 147.
[12] RP (Nov. 19, 2013) at 150.

11

least three times, with enough force to break the skull nearly in half. And the most serious of those blows came when Smith was on the ground or nearly on the ground.

Satisfied that the jury's guilty verdict is not attributable to Deputy Gagnon's and Detective Walford's opinion testimony, and that any reasonable jury would necessarily have convicted Stein without that testimony, we hold that this error was harmless beyond a reasonable doubt.

Exclusion of Swastika Tattoo

Stein also argues that the trial court denied him his constitutional right to present a defense by excluding evidence that Smith had at least one swastika tattoo. We conclude that the exclusion did not violate Stein's rights because the prejudicial effect of the tattoo evidence is much greater than Stein's need to use it.

There are two threshold questions about this issue. First, whether the exclusion of the swastika tattoo testimony presents a constitutional or evidentiary question. Second, whether Stein properly preserved this issue below. If this is an evidentiary issue, Stein waived it by failing to renew his objection after the trial court made a tentative ruling excluding the tattoo. State v. Riker, 123 Wn.2d 351, 369, 869 P.2d 43 (1994). Assuming this is a constitutional question, Stein is correct that RAP 2.5(a)(3) would allow him to challenge the trial court's exclusion of Smith's swastika tattoo.

The Sixth Amendment provides criminal defendants with the right to present a defense, which includes the right to "offer testimony." State v. Jones, 168 Wn.2d 713, 720, 230 P.3d 576 (2010). Courts use a "three-prong approach" for

determining whether they must admit a criminal defendant's offered evidence:

> First, the evidence must be of at least minimal relevance. Second, if relevant, the burden is on the State to show the evidence is so prejudicial as to disrupt the fairness of the fact-finding process at trial. Finally, the State's interest to exclude prejudicial evidence must be balanced against the defendant's need for the information sought, and only if the State's interest outweighs the defendant's need can otherwise relevant information be withheld.

State v. Darden, 145 Wn.2d 612, 622, 41 P.3d 1189 (2002). No State interest is compelling enough to compel the exclusion of evidence with "high probative value." Jones, 168 Wn.2d at 721.

The defendant must first establish that his offered evidence is at least minimally relevant. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. Evidence of "a defendant's hostility toward his victims" may be probative of "motive and intent." State v. Finch, 137 Wn.2d 792, 822-24, 975 P.2d 967 (1999). Even hostility toward a racial group, rather than an individual person, may be relevant to a defendant's motive. Finch, 137 Wn.2d at 822.

Once the defendant shows that evidence is relevant, the State must show the evidence is unfairly prejudicial. Evidence creates a risk of unfair prejudice if it is "likely to stimulate an emotional response rather than a rational decision." State v. Powell, 126 Wn.2d 244, 264, 893 P.2d 615 (1995). In State v. Barry, the court noted that pictures showing the defendant had spray-painted "KKK" on three different properties had a "potentially high danger of unfair prejudice" because of its racist implications. 184 Wn. App. 790, 802, 339 P.3d 200 (2014).

If evidence is both relevant and prejudicial, the court needs to balance the defendant's need for the evidence against the State's interest in excluding it. The State has a compelling interest in ensuring a just trial and preventing an acquittal based on prejudice against the victims. State v. McDaniel, 83 Wn. App. 179, 187, 920 P.2d 1218 (1996).

We review claimed violations of the Sixth Amendment right to present a defense de novo. Jones, 168 Wn.2d at 719.

Smith's autopsy revealed that he had at least one swastika tattoo.[13] There is no evidence Stein was aware of the tattoo during his encounters with Smith.

Stein argued that Smith's tattoo was relevant because it tended to show that Smith was the initial attacker, a material fact in this case. Stein argued that Smith's motive to attack him could have been that "a black young man [was] trying to take [Smith's] white – steal [Smith's] girlfriend."[14] Stein contends that the swastika tattoo is relevant because, as a symbol of white supremacy, it makes it more likely that Smith would harbor racial animus. Despite arguing in its brief that the connection between Smith's swastika tattoo and any motive to attack Stein is too tenuous to be relevant, the State conceded at oral argument that the tattoo was at least minimally relevant.

The State argues that evidence of Smith's swastika tattoo is extremely inflammatory and therefore prejudicial. We agree with the State that it would be difficult "to find a more reviled group to associate with than the Nazi party."[15] Some

---

[13] Stein argues that there may have been two swastika tattoos but there is no evidence of a second tattoo in the record.
[14] RP (Oct. 31, 2013) at 27.
[15] Respondent's Br. at 37-38.

jurors would have such a strong emotional reaction to the swastika tattoo that it would override their ability to decide the case rationally. Therefore, the swastika tattoo was prejudicial.

Finally, we weigh Stein's need for the information against the State's interest in ensuring that the trial is not based on prejudice. Stein's need for this evidence was low. This is not a case where the evidence would have been a complete defense to Stein's charge. The tattoo would only have added to Stein's argument that he killed Smith as he defended himself from Smith's racially-motivated attack.

But Stein did not need the tattoo to show Smith's racial animus. Stein was able to testify that Smith used the racial slur "n[*****]" when Smith confronted him the night before Smith's death, and when Smith attacked him in the trailer.[16] Nor did Stein need the swastika tattoo to corroborate Smith's use of racial slurs. Hedin, who was Smith's friend, admitted that Smith had called Stein a "n[*****]" the night before.[17]

The swastika tattoo adds little to Stein's motive argument. On the other hand, the jury, upon learning that Smith had a swastika tattoo, would likely have condemned Smith as a racist. This view of Smith would have provoked a prejudicial response that damaged the jury's ability to make rational decisions. Therefore, the State's interest in excluding the tattoo outweighed Stein's need to introduce it. We hold that the trial court did not err by excluding the tattoo.

---

[16] RP (Nov. 19, 2013) at 127, 131, 144.
[17] RP (Nov. 12, 2013) at 42.

15

## Ineffective Assistance of Counsel

Stein argues that he received ineffective assistance of counsel. He contends that his trial attorney's failure to ensure that the jury received an instruction on the use of deadly force was unreasonable, especially given the attorney's closing argument that Stein was allowed to use deadly force to defend himself if he believed Smith had a gun. Because Stein has not shown that this was unreasonable, we hold that Stein's trial counsel did not provide ineffective assistance.

The Sixth Amendment guarantees criminal defendants the right to the assistance of counsel. Strickland v. Washington, 466 U.S. 668, 684, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To prevail on a claim of ineffective assistance, the defendant must first show that trial counsel's performance "fell below an objective standard of reasonableness," and second that the defendant was prejudiced by trial counsel's deficient performance. State v. Sutherby, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). If a party fails to satisfy either the deficiency or the prejudice prong, a reviewing court need not consider the other. State v. Foster, 140 Wn. App. 266, 273, 166 P.3d 726 (2007).

To show deficient performance, the defendant must show that there was no "legitimate strategic or tactical reason" to explain trial counsel's act or failure to act. Sutherby, 165 Wn.2d at 883. "[E]xceptional deference must be given when evaluating counsel's strategic decisions." State v. McNeal, 145 Wn.2d 352, 362, 37 P.3d 280 (2002).

To establish prejudice, a defendant must show by "a reasonable probability that, but for counsel's unprofessional errors, the outcome of the proceeding would have been different." State v. Nichols, 161 Wn.2d 1, 8, 162 P.3d 1122 (2007).

We review claims of ineffective assistance of counsel de novo because the claims present mixed issues of fact and law. Sutherby, 165 Wn.2d at 883.

Stein argues that his trial counsel was ineffective for failing to request that the court instruct the jury on the use of deadly force, but nevertheless arguing that Stein would have been justified in using deadly force. Here, the court instructed the jury that people may use force in self-defense, but that the amount of force must be reasonable and not more than necessary:

> The use of force upon or toward the person of another is lawful when used by a person who reasonably believes that he is about to be injured, and when the force is not more than is necessary.
>
> The person using the force may employ such force and means as a reasonably prudent person would use under the same or similar conditions as they appeared to the person, taking into consideration all of the facts and circumstances known to the person at the time of the incident.[18]

Stein claims that his attorney should have also requested *Washington Pattern Jury Instruction* 16.02, the instruction on the use of deadly force in self-defense:

> It is a defense to a charge of [murder] [manslaughter] that the homicide was justifiable as defined in this instruction.
>
> Homicide is justifiable when committed in the lawful defense of [the slayer] . . . when:
>
> (1) the slayer reasonably believed that the person slain . . . intended [to commit a felony] [to inflict death or great personal injury];
>
> (2) the slayer reasonably believed that there was imminent danger

---

[18] CP at 136; 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 17.02, at 253 (3d ed. 2008).

of such harm being accomplished; and

(3) the slayer employed such force and means as a reasonably prudent person would use under the same or similar conditions as they reasonably appeared to the slayer, taking into consideration all the facts and circumstances as they appeared to [him] [her], at the time of [and prior to] the incident.

During closing argument, Stein's trial counsel argued that, because Stein believed Smith had a gun, Stein would have been justified in using deadly force. This is consistent with both the more general self-defense instruction and the use of deadly force instruction. As the State points out, if a defendant feared substantial bodily harm or death, his use of deadly force would be reasonable under the instruction the court gave.

Stein's trial attorney could reasonably have believed that two different instructions on self-defense would have confused the jury. The deadly force instruction, alone, might have appeared to the jury as a concession that Stein intentionally used deadly force, contrary to Stein's testimony at trial that he was not trying to kill Smith. Therefore, Stein's attorney's choice to have the court instruct the jury on only the more general theory of self-defense was not unreasonable. Similarly, we cannot say that his choice to argue that Stein was entitled to use deadly force was unreasonable based on the facts of this case and under the given instruction.

Stein has not shown that his trial counsel's requested jury instructions, closing argument, or the combination of the two fell below reasonable standards. But, even assuming this was unreasonable, Stein has not shown that there is a reasonable probability that the outcome of the trial would have been different if his

attorney had either requested the use of deadly force jury instruction or not made those arguments during closing. In short, Stein fails to show ineffective assistance of counsel.

## Cumulative Error

Finally, Stein argues that even if any one of the alleged errors does not warrant reversal, their cumulative effect denied him a fair trial. "The accumulation of errors may deny the defendant a fair trial and therefore warrant reversal even where each error standing alone would not." State v. Davis, 175 Wn.2d 287, 345, 290 P.3d 43 (2012). The defendant bears the burden of proving that the "accumulated prejudice affected the outcome of the trial." In re Pers. Restraint of Cross, 180 Wn.2d 664, 690, 327 P.3d 660 (2014). Because there was only one error, the cumulative error doctrine does not apply.

Affirmed.

_Trickey, J_

WE CONCUR:

_Spearman, J_          _Becker, J._

19