IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

Respondent,

v.

L.D.E.P.,

Appellant.

No. 84150-5-I

DIVISION ONE

UNPUBLISHED OPINION

COBURN, J. — 13-year-old L.D.E.P. was charged with seven counts related to six fires set on two different days at his apartment complex. Following a bench trial, the court found L.D.E.P. not guilty of arson in the second degree and reckless burning for a fire started on the first date, but guilty of attempted arson in the first degree in three counts and guilty of arson in the first degree in the remaining two counts for fires set nine days later. L.D.E.P. challenges the denial of his motions to sever counts and his motion to suppress statements made in two different interviews, one that took place at the apartment complex with his family present and another that occurred at the police station. We affirm.

FACTS

In May 2021, 13-year-old L.D.E.P. lived with his parents and younger brother in

Citations and pincites are based on the Westlaw online version of the cited material.

an apartment complex in Everett, Washington.  The building was four stories tall, with over a hundred units, and an open stairwell in each of the four corners of the building.

On May 7, L.D.E.P. left to take a small load of trash out of the apartment to the dumpster located on the southeast corner of the building, which was something he did regularly.  Next to the dumpster was an area where people discarded furniture.  L.D.E.P. returned to his apartment and told his father that there was a fire occurring in the "furniture section" of the dumpster.  His father instructed L.D.E.P. to stay at the apartment while the father went to look at the dumpster area.  The father saw furniture on fire and an older man standing nearby watching it, which he thought was "highly odd."

Several weeks later, a potential witness, a child named A.G., came forward.  A.G., who was 10 years old at the time of trial in 2022, testified that while she walked back and forth from her apartment to the laundry room she saw L.D.E.P. throwing trash away at the dumpster.  She recognized L.D.E.P. as someone who lived in the complex.  For a few seconds she saw him leaning down about six inches away from a couch that was emitting smoke and then walked away.

On May 16, there were five fires at the apartment complex—two in the morning (northeast stairwell and southeast stairwell) and three in the afternoon (doormat outside apartment 426, on the balcony of apartment 407, and the southwest stairwell).

Before there were any indications of any fires, L.D.E.P.'s family left him alone in the morning and ran errands for about 35 to 60 minutes when the first two fires were set.  One of the morning fires was set in the stairwell next to L.D.E.P.'s apartment in the northeast corner of the complex.  A resident smelled smoke through an open window of

2

his apartment and tracked the smoke to a cardboard box filled with paper and what looked like pieces of clothing on fire. He put out the fire by stomping on it and using a fire extinguisher as another resident called 911. The fire alarm did not go off during this event.

Assistant Fire Marshal Stephen Goforth responded and investigated. He first investigated the northeast stairwell fire near L.D.E.P.'s apartment noticing a cardboard box with some items around it. He also saw a green and red cloth material and a shirt in the area. He noticed charring and what looked to be a fire pattern on a vertical member of the stairwell railing. He opined that the fire was intentionally set based on the location and materials used to start the fire, reasoning that these materials would not have accidentally, naturally, or spontaneously ignited. He believed the materials were brought to the area with the intent to start a fire.

When he looked around, he saw evidence of what had been another fire in the southeast corner of the complex. Goforth noticed partially burned notebook paper and char marks against the wall. He noted that the origin of the fire was under the baseboard of a wall. He explained that the fire did not spread because the wallboard had fire protection on it, there was not enough fuel, and the fire did not have the right materials to continue. He opined that both fires appeared to have been set by a handheld open flame device, such as "a cigarette lighter, barbecue lighter, some sort of butane lighter," and they were intentionally set. He left after this investigation without having any interaction with L.D.E.P. or his family.

L.D.E.P.'s family returned to the apartment complex, and their neighbors told them there had been a fire in the stairwell and the fire department had been there.

L.D.E.P.'s father spoke to the firefighters in passing but not about "anything serious." Later that afternoon, L.D.E.P.'s family left again and three afternoon fires were set while they were away. The fires were located on the welcome mat outside of apartment 426, in the southwest stairwell between the first and second floor, and on the balcony of apartment 407 on the fourth floor.

The doormat outside apartment 426 was found burned, though the fire was out by the time it was discovered—no one saw how the fire started or who started it. A tenant discovered a burnt cardboard box in the southwest stairwell between the second and third floors. No one saw anyone in the stairwell, and there was no evidence of who or what caused the fire. Finally, the fire on the balcony of apartment 407 was extinguished by a tenant before the fire department arrived. The tenant did not see anyone or anything unusual, or what caused the fire.

The fire alarms went off while L.D.E.P. was home alone. As the fire department responded, L.D.E.P. repeatedly called his family to tell them about the fires and give them updates. L.D.E.P. sent his mother audio and video messages as he ran around the complex capturing the firefighters in action and some of the extinguished fires. A video capturing these messages was admitted as evidence at trial. In one of the messages, L.D.E.P. explained how he was going to try and ask the resident of apartment 426 if he could take a picture of "the fire I was trying to start" in front of her door. In another message, L.D.E.P. told his mom there were fires on a porch, in two staircases and by apartment 426: "that's four fires I tried to start or whoever tried to start." He also told his mother about his conversation with a resident of the complex, "I told her about all of the fires I was trying to get started." He then laughed and stated,

4

"Her mind was blown."

Goforth was dispatched back to the apartment complex at around 2:00 p.m. to investigate the afternoon fires. He hypothesized that someone set the fire on the fourth floor balcony by igniting flammable materials and tossing them onto the balcony from a nearby walkway. The fire remnants contained a possible backpack with a blue and orange pattern, which was similar to the cloth found in the morning fire. Goforth continued his investigation of the fire outside apartment 426, L.D.E.P.'s former apartment. He saw that there was a welcome mat that appeared to be melted, or something had been burned on top of it, because the char or the area of origin was wider than just the rectangle mat. The apartment 426 resident testified that when she was speaking to an officer about the fire, L.D.E.P. overheard her and appeared really excited and asked, "Oh, really, where? Where? Where is the fire?" L.D.E.P. held his phone in his hand, recording, and asked if he could follow the resident to where the fire was at her apartment. Goforth noticed the burned materials were again white paper and parts of a shirt. All of the fires were started in a similar manner using cardboard, paper, and cloth. Goforth believed the fires were started with an open flame device, such as a lighter. He additionally noticed a burn mark next to L.D.E.P.'s apartment that appeared to have been caused by an open flame handheld device.

Goforth noted that during the investigation, L.D.E.P. was videotaping the fires from close range when no one else did. Goforth had training in conditions and behaviors of juveniles setting fires, and he stated that juveniles older than 12 set fires as a way to draw attention to themselves sometimes when they are struggling with problems at home or at times mental illnesses.

The building manager, assistant manager, and another tenant identified a suspect, Wesley Larson. Larson had a history with the building. He was an unauthorized occupant, smoked in the elevators, parked without a permit, and once used a ladder to climb into someone's apartment. After Larson's car was towed shortly before the May 16 fires, he was angry and stormed into the building office screaming. He told the manager, "you'll get what's coming to you." He told another tenant, "Don't worry, I got something for their ass."

On May 18, Detective Christopher Olsen and Goforth went to speak with L.D.E.P. at the apartment complex for about 20 to 30 minutes. Olsen spoke to L.D.E.P.'s mother before asking if he could speak to L.D.E.P., and she agreed. L.D.E.P., his mother, his brother, Olsen, and Goforth sat around a large table in a large community room in the complex. L.D.E.P.'s father listened in by speakerphone. Olsen sat about a foot away from L.D.E.P. At the time, Olsen considered L.D.E.P. a person of interest but did not tell him he was a suspect. Olsen stated that he did not "remember the exact[] verbiage" he used to tell L.D.E.P. that the interview was voluntary, but he knew that he explained that as a practice. When the State asked Goforth if Olsen explained that the interview was voluntary, Goforth stated, without objection, "Yes, I believe so." Olsen asked L.D.E.P. if he had any problems with Olsen recording the interview. L.D.E.P. said he did not have any problem. L.D.E.P. said he had nothing to hide and was absolutely confident he did not set the fires. Olsen asked to see the messages L.D.E.P. sent his mother. L.D.E.P.'s mother scrolled through L.D.E.P.'s phone while Olsen watched and recorded a copy of the video and audio messages L.D.E.P. sent to his mother. At the end of the interview, L.D.E.P. signed a statement

acknowledging his statements were "made freely, voluntarily, and without threats or promises of any kind" and also acknowledged it verbally. When Olsen asked L.D.E.P. about the statements he made in the messages, L.D.E.P. said that is not what he meant to say.

At trial, L.D.E.P. testified that he did not remember if the interview with Olsen was voluntary. But he also testified that he signed the statement freely, and felt at the time of the interview that it was voluntary. L.D.E.P.'s mother and father also both testified that the interview was voluntary. When the State asked L.D.E.P. if he felt as though he could end the interview, he responded, "At some points, no."

About two months later, Detective Karen Kowalchyk conducted the second interview of L.D.E.P. at the police station. Kowalchyk spent 40 minutes of the three-hour interview speaking to L.D.E.P. and his dad and advising L.D.E.P. of his constitutional rights. L.D.E.P. and his father both signed a written statement acknowledging L.D.E.P.'s right to remain silent and to an attorney. The statement also indicated that L.D.E.P. could exercise his rights at any time and asked if L.D.E.P. understood his rights. Kowalchyk informed L.D.E.P. he could leave the interview at any time. Kowalchyk sat behind a desk and L.D.E.P. sat in a chair in front of the desk with the closed door behind him. At trial, L.D.E.P.'s father testified that L.D.E.P. volunteered for the interview. When asked if anyone asked him if he wanted to do the interview, L.D.E.P. testified, "I had the option if I wanted to do it or not." L.D.E.P. testified he did not know who spoke to him first about the interview, but knew in advance that he was going to the police station to be interviewed. L.D.E.P. testified at trial that he understood he was free to leave the interview. He understood that the interview was

recorded and it could be used against him in court. When the State asked if he understood that he had the right to talk to an attorney, he responded, "I don't think so." But L.D.E.P. also testified that he understood everything that was read to him that day from the form he signed.

During the interview, L.D.E.P. said he used to be fascinated with the crackling and noise of a fire, but that he was no longer interested. He denied any involvement with the fires and suggested that it may have been started by a group of young people who got their mom or dad's lighter and put it down on the ground and messed with it. While offering this theory, L.D.E.P. gestured with his hand as if flicking a lighter. He later claimed he did not know how to use a lighter and only gestured based on what he has seen others do. He conceded in the interview that his statements in the messages to his mother looked "very, very, very suspicious." He explained that words "accidentally slipped out" because he was so shaky with adrenaline. The interview concluded when L.D.E.P. asked to go home.

The State charged L.D.E.P. with arson in the second degree and reckless burning in the second degree for the May 7 fire, and five counts of arson in the first degree for the May 16 fires.

PROCEDURAL HISTORY

Before trial, L.D.E.P. moved to sever his charges into two trials under CrR 4.4. He first proposed severing the two counts related to the May 7 fire from the remaining counts relating to the May 16 fires. The State opposed the motion. L.D.E.P. then proposed in his reply an additional request to sever the May 16 morning fires from the afternoon fires. The court issued a detailed denial to the motions to sever.

About two weeks later, the defense renewed its motions to sever in front of the trial judge during motions in limine, which the court again denied, reasoning that it could separate the acts. The defense again unsuccessfully renewed the motion during trial two days later. L.D.E.P. agreed with the State that the issue was previously decided in a pre-trial motion and L.D.E.P. conceded that it did not have additional evidence to present as to that issue.

The parties proceeded to trial, which incorporated the CrR 3.5 hearing. The trial court made several findings and concluded that L.D.E.P. was not in custody during the time of either interview with detectives, and that L.D.E.P. understood he was participating in the interviews knowingly, voluntarily, and freely. Additionally, the trial court also concluded that L.D.E.P. was read his Miranda rights in the interview at the police station and that he made a knowing and voluntary waiver of those rights. The trial court ruled that the statements L.D.E.P. made in the interviews with the detectives were admissible under CrR 3.5.

L.D.E.P. testified during trial and denied starting the fires. He testified that in the morning of the May 16 fires after his family left, he left his apartment because the fire alarm went off, he smelled smoke in the hallway, and he wanted to call his parents. L.D.E.P. testified that the fire in the morning was in a stairwell near his apartment. L.D.E.P. was asked about the video message he made about apartment 426 where he used the pronoun "I" in talking about having tried to start a fire in front of that unit's door. L.D.E.P. responded that "[i]nstead of 'I,' it would be 'someone.'" He explained that he was scared, panicked and had a lot of adrenaline, which does not help when he stutters sometimes, and how all that tends to mess up his words a lot. L.D.E.P.'s father testified

that when L.D.E.P. gets nervous he gets "really jittery" and "stumbles over his words." L.D.E.P. said the same thing happened in another video message where he unintentionally stated, "The fires I tried to start."

At the end of trial, the court made findings and conclusions. The court found L.D.E.P. not guilty on counts related to the May 7 fire. The court agreed with defense counsel and found L.D.E.P. guilty of the lesser included crime of attempted arson in the first degree for the morning southeast stairwell fire, the afternoon southwest stairwell fire and the fire on the doormat outside apartment 426. The court found L.D.E.P. guilty of arson in the first degree for the morning fire in the northeast stairwell and the fire on the balcony of apartment 407.

L.D.E.P. appeals.

## DISCUSSION

### Motion to Sever

L.D.E.P. argues that the trial court denied him his right to a fair trial when it denied his motion to sever. L.D.E.P. specifically argues that he was prejudiced by the denial of his motion to sever because the trial court "cumulated evidence and inferred [L.D.E.P.] had a propensity for arson." We disagree.

"Severance" refers to dividing joined offenses into separate charging documents. State v. Bluford, 188 Wn.2d 298, 306, 393 P.3d 1219 (2017) (citing CrR 4.4(b)). A party must generally move for severance pretrial and renew a denied pretrial motion for severance "before or at the close of all the evidence." Id. (citing CrR 4.4(a)(2)). A trial court has broad discretion to grant a severance when it is deemed appropriate or necessary "to promote a fair determination of the guilt or innocence of a defendant."

10

CrR 4.4(c)(2)(i). CrR 4.3(a)(2) "should be construed expansively to promote the public policy of conserving judicial and prosecution resources." State v. Bryant, 89 Wn. App. 857, 864, 950 P.2d 1004 (1998). However, offenses joined under CrR 4.3(a) may be severed if the court determines that a severance will promote a fair determination of the defendant's guilt or innocence of each offense. State v. Bythrow, 114 Wn.2d 713, 717, 790 P.2d 145 (1990). On appeal, "[t]o establish error, [the defendant] must also show that the prejudicial effect of trying all the counts together outweighed the benefits of joinder." Bluford, 188 Wn.2d at 315.

Defendants seeking severance have the burden of demonstrating that a trial involving multiple counts would be so manifestly prejudicial as to outweigh the concern for judicial economy. Id. at 316. We do not disturb a trial court's decision to grant or deny a severance absent a manifest abuse of discretion. State v. Emery, 174 Wn.2d 741, 752, 278 P.3d 653 (2012). The burden is on the defendant to come forward with sufficient facts to warrant the exercise of discretion in his or her favor. Id. To support "a finding that the trial court abused its discretion, the defendant must be able to point to specific prejudice." Id. (quoting State v. Grisby, 97 Wn.2d 493, 507, 647 P.2d 6 (1982)).

To determine whether the trial court's refusal to sever requires reversal, an appellate court must balance the prejudicial effect of admitting evidence of multiple offenses against the following prejudice-mitigating factors:

> (1) the strength of the State's evidence on each count, (2) the clarity of defenses as to each count, (3) whether the trial court properly instructed the jury to consider the evidence of each crime, and (4) the admissibility of evidence of the other crimes.

11

State v. Craven, 69 Wn. App. 581, 586-87, 849 P.2d 681 (1993). Misapplication of one prong does not necessarily require reversal. State v. Watkins, 53 Wn. App. 264, 272, 766 P.2d 484 (1989).

The State concedes that the strengths of the counts do greatly vary as there was an eyewitness as to the counts that related to the May 7 fire and only circumstantial evidence as to the counts relating to the May 16 fires. This factor weighs in favor of severance.

Second, the court considers the clarity of defenses as to each count. State v. Russell, 125 Wn.2d 24, 63, 882 P.2d 747 (1994). At trial, L.D.E.P. conceded that his defense for all counts was general denial. On appeal he raises a new argument that his defenses were frustrated because he presented other suspect evidence that was different for separate charges. He presented evidence of one suspect for the furniture fire on May 7 and evidence of a different suspect for the May 16 fires. Appellate courts generally will not review an issue, theory, or argument not presented at trial. State v. Thompson, 55 Wn. App. 888, 892, 781 P.2d 501 (1989) (declining to consider a new prejudice argument on appeal that was not raised below in a motion to sever). This is so "the trial court an opportunity to correct any error, thereby avoiding unnecessary appeals and retrials." Id. (citing Smith v. Shannon, 100 Wn.2d 26, 37, 666 P.2d 351 (1983)). Also, L.D.E.P. does not provide any argument as to why or how his defenses are frustrated by the fact there is different other suspects for different counts. See RAP 10.3(a)(6); Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (argument unsupported by reference to the record or citation to authority will not be considered). We decline to consider this new argument raised on appeal.

Because the defense of general denial is the same for all counts, this factor weighs against severance.

Third, the court considers the instructions to the jury to consider each count separately. Russell, 125 Wn.2d at 63. There was no concern of needing to instruct a jury to consider each count separately because L.D.E.P. had a bench trial. The court was required to make factual findings, and it is presumed the trier of fact in a juvenile adjudication will consider evidence for its proper purpose and will not consider inadmissible evidence. State v. Read, 147 Wn.2d 238, 245, 53 P.3d 26 (2002). This factor weighs against severance.

Fourth, the court considers the admissibility of evidence of other charges even if not joined for trial. Russell, 125 Wn.2d at 63.

The court that first heard the motion to sever found that this factor weighed against severance because the evidence would have been cross-admissible through res gestae. The "res gestae" exception to the rule prohibiting admission of evidence of other offenses permits the admission of evidence of other crimes or misconduct where it is a link in the chain of an unbroken sequence of events surrounding the charged offense in order for a complete picture be depicted for the jury. State v. Acosta, 123 Wn. App. 424, 442, 98 P.3d 503 (2004).

As to severing the morning May 16 counts from the afternoon May 16 counts, L.D.E.P. argues the evidence supporting the morning counts were much weaker than the evidence supporting the afternoon counts. This ignores the similarities between the morning and afternoon fires. Both morning and afternoon fires used cardboard, paper, and cloth materials. There was also a blue and orange t-shirt used for both the morning

13

and afternoon fires. Additionally, each of the fires were started using an open handheld flame device. L.D.E.P. also had a personal connection to the afternoon fire in front of apartment 426, his family's previous apartment, and the morning fire in the stairwell next to L.D.E.P.'s current apartment. L.D.E.P.'s own statements connected himself to both the morning and afternoon fires. In one of the messages L.D.E.P. left for his mom, he listed the fire on the "porch," two on a staircase, and the fire in front of apartment 426 and said, "that's four, four fires I tried to start, or whoever tried to start."

However, we are not persuaded that res gestae supports the cross-admissibility of the evidence related to the May 7 fire with the evidence supporting the May 16 fires. There is no link in the chain of an unbroken sequence of events between the May 7 fire and the May 16 fires. This factor weighs against severing the morning May 16 fires from the afternoon fires, but weighs in favor of severing the May 7 counts from the May 16 counts.

Nevertheless, "[e]ven if separate counts would not be cross-admissible in separate proceedings, this does not as a matter of law state sufficient basis for the requisite showing by the defense that undue prejudice would result from a joint trial." State v. Markle, 118 Wn.2d 424, 439, 823 P.2d 1101 (1992) (citations omitted). This is especially true in a bench trial where the court is aware of separating the counts.

The trial court properly held that the judicial economy outweighed any possible prejudice in this case. The trial court found there was an overlap of eight witnesses, four of whom were civilians, two of whom had material witness warrants issued for their arrest and detention, and one of whom was a minor child.[1]

---

[1] L.D.E.P. does not assign error to these findings and, thus, they are verities on appeal. State v. Broadaway, 133 Wn.2d 118, 131, 942 P.2d 363 (1997).

We conclude that L.D.E.P. has not met his burden of demonstrating that a bench trial involving all the counts was so manifestly prejudicial as to outweigh the concern for judicial economy warranting reversal in a case where the court found L.D.E.P. not guilty of the counts related to the May 7 fire.

CrR 3.5 Motion to Suppress

All persons have constitutional rights when they are subject to custodial interrogation, and the State cannot admit an accused's statements unless there were "procedural safeguards effective to secure the privilege against self-incrimination." Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); U.S. CONST. amends. V, VI, XIV; CONST. art. 1, §§ 3, 9. The Miranda rule applies when the interview or examination is a custodial interrogation by a state agent. State v. Post, 118 Wn.2d 596, 605, 826 P.2d 172, 837 P.2d 599 (1992) (citing State v. Sargent, 111 Wn.2d 641, 649-53, 762 P.2d 1127 (1988)). Where people are interrogated while in police custody, they must be informed of their right to remain silent, anything may be used against them in court, they are entitled to an attorney, and, if they cannot afford an attorney, one will be provided for them. Miranda, 384 U.S. at 479. These principles apply to children. See In re Gault, 387 U.S. 1, 87 S. Ct. 1428, 18 L. Ed. 2d 527 (1967) abrogated on other grounds by Allen v. Illinois, 478 U.S. 364, 106 S. Ct. 2988, 92 L. Ed. 2d 296 (1986).

To determine if a person is in custody, the court utilizes an objective test—"whether a reasonable person in a suspect's position would have felt that his or her freedom was curtailed to the degree associated with a formal arrest." State v. Heritage, 152 Wn.2d 210, 218, 95 P.3d 345 (2004). This test also applies to juveniles. See id.

Under RCW 13.40.140(11), a parent can only waive a child's rights if the child is under the age of 12. L.D.E.P. notes that children are particularly vulnerable to police interrogation, and their competence relative to adults increases their susceptibility to interrogation techniques. (citing Barry C. Feld, *Police Interrogation of Juveniles: An Empirical Study of Policy and Practice*, 97 J. CRIM. L. & CRIMINOLOGY 219, 244 (2006). L.D.E.P. asks this court to hold that children must consult with an attorney before waiving their Miranda rights. L.D.E.P. is essentially asking this court to apply RCW 13.40.740 to this case despite the fact it was not yet in effect at the time of L.D.E.P.'s interviews with detectives.

RCW 13.40.740(1), which became effective on January 1, 2022, provides that children cannot knowingly, intelligently, and voluntarily waive their Miranda rights until they have consulted with an attorney. This protection is so important that the mandatory attorney consultation cannot be waived under any circumstance. RCW 13.40.740(2).

L.D.E.P. argues that this court should apply the new statute to L.D.E.P.'s matter despite the fact the interviews occurred before the new law went into effect. However, L.D.E.P. fails to present any retroactive analysis. "As a general rule, courts presume that statutes operate prospectively unless contrary legislative intent is express or implied." State v. Humphrey, 139 Wn.2d 53, 60, 983 P.2d 1118 (1999). RCW 10.01.040 requires courts to presume criminal statutes, or amendments to criminal statutes, apply prospectively only unless the legislature expressly states otherwise. State v. Bass, 18 Wn. App. 2d 760, 787, 491 P.3d 988 (2021).

L.D.E.P. cites to State v. Jefferson, 192 Wn.2d 225, 249, 429 P.3d 467 (2018) to support his position, but the Washington Supreme Court in Jefferson held that GR 37, which was not in effect at the time of the challenged voir dire, was not retroactive despite the fact that GR 37 attempts to address the very issue raised in Jefferson—unconscious bias in jury selection. The court nevertheless modified the Batson test, which was designed to determine whether a peremptory strike was impermissibly racially motivated. Jefferson, 192 Wn.2d at 231 (citing Batson v. Kentucky, 476 U.S. 79, 92-93,106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986)). However, a court modifying a court-created test does not support applying a criminal statute retroactively when the legislature has not expressed such intent.

Regardless, RCW 13.40.740 only applies when a juvenile is in custody, which is not the case here. This is not to say courts should treat children the same as adults in their analyses. Under the current legal framework of applying an objective test, considering a reasonable person in a suspect's position inherently requires consideration of the fact a person is a child and not an adult. Courts must still consider the child's "age, experience, intelligence, education, and background; whether he or she has the capacity to understand any warnings given and his or her Fifth Amendment rights, and the consequences of waiving these rights." State v. Unga, 165 Wn.2d 95, 103, 196 P.3d 645 (2008) (citing Fare v. Michael C., 442 U.S. 707, 725, 99 S. Ct. 2560, 61 L. Ed. 2d 197 (1979)). "[C]ourts have a responsibility to examine confessions of a juvenile with special care." Id. at 103. "Only if the totality of the circumstances surrounding the interrogation reveals both an uncoerced choice and the requisite level

17

of comprehension may a court properly conclude that the <u>Miranda</u> rights have been waived." <u>State v. Mayer</u>, 184 Wn.2d 548, 556, 362 P.3d 745 (2015) (citations omitted).

Next, in appealing the trial court's CrR 3.5 ruling, L.D.E.P. makes several challenges to the court's findings of fact.

"[F]indings of fact entered following a CrR 3.5 hearing will be verities on appeal if unchallenged, and, if challenged, they are verities if supported by substantial evidence in the record." <u>Broadaway</u>, 133 Wn.2d at 131. "'Substantial evidence' is evidence sufficient to convince a fair-minded person of the truth of the finding." <u>State v. Hardgrove</u>, 154 Wn. App. 182, 185, 225 P.3d 357 (2010) (citations omitted). After reviewing whether the trial court's findings are supported by substantial evidence, this court then makes "a de novo determination of whether the trial court derived proper conclusions of law from those findings." <u>State v. Piatnitsky</u>, 170 Wn. App. 195, 222, 282 P.3d 1184 (2012) (quoting <u>State v. Armenta</u>, 134 Wn.2d 1, 9, 948 P.2d 1280 (1997)). Credibility determinations are the province of the trial court and will not be disturbed on appeal. <u>Id.</u> (citing <u>State v. Radcliffe</u>, 139 Wn. App. 214, 220, 159 P.3d 486 (2007)).

*A. Interview in the community room*

L.D.E.P. first contends that he was in custody when Olsen interviewed him in the community room of the apartment complex and was not informed of his <u>Miranda</u> rights. We disagree.

L.D.E.P. first challenges the trial court's finding of fact 4 that L.D.E.P. was aware he was free to leave from the first interview. The interview took place in the apartment complex's large community room with L.D.E.P.'s mother and brother by his side and his father present through speakerphone. Olsen asked L.D.E.P.'s mother if Olsen could

speak with him.  L.D.E.P. and his family were on the side of the room with direct access to the doorway and Olsen and Goforth were on the inside of the room.  Goforth testified that Olsen told L.D.E.P. he was free to leave at any time.  Substantial evidence supports finding of fact 4.

L.D.E.P. next challenges the court's finding of fact 5 that the interview was voluntary.  L.D.E.P. testified at trial that he did not remember if he was told the interview was voluntary, and that at some points he did not feel he could end the interview.  However, Olsen and Goforth testified that Olsen told L.D.E.P. the interview was voluntary.  L.D.E.P.'s mother and father also both testified that the interview was voluntary.  L.D.E.P. also acknowledged the interview was voluntary by signing his name to a statement indicating the interview was voluntary.  Goforth testified that Olsen did not coerce L.D.E.P. into speaking.  The interview was recorded with L.D.E.P.'s permission and nothing in the interview suggests intimidation or coercion by Olsen or expressions of fear or confusion by L.D.E.P.  Although L.D.E.P. testified that at times he did not feel free to leave, other evidence disputed that and this court does not disturb credibility determinations.  State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990), abrogated on other grounds by State v. Crossguns, 199 Wn.2d 282, 505 P.3d 529 (2022).

L.D.E.P. cites State v. D.R., 84 Wn. App. 832, 930 P.2d 350 (1997) to argue that he was in custody.  In that case, the juvenile defendant was not informed he was free to leave, was interviewed in the principal's office of his school, and the interrogation was accusatory.  Id. at 838.  Unlike the juvenile in D.R., in the instant case, L.D.E.P. was in

19

his apartment complex accompanied by his family, and was informed that he was free to leave.

We conclude that substantial evidence supports the court's findings and the findings support the court's conclusion that L.D.E.P. was not in custody during the interview.

*B. Interview in police station*

L.D.E.P. challenges the court's finding of fact 8 that L.D.E.P. came to the police station to be interrogated by Kowalchyk and he understood the interrogation was voluntary. L.D.E.P. also challenges finding of fact 9 that L.D.E.P.'s father was present for half the interrogation with Kowalchyk. L.D.E.P. challenges finding of fact 12 that L.D.E.P. agreed to participate in the interrogation, that he knowingly and voluntarily waived his Miranda rights, that he understood what was going on, that he understood he could have an attorney, and that he understood he did not have to stay and could leave at any time. L.D.E.P. also challenges finding of fact 13 that L.D.E.P. understood he was free to leave the interrogation and gave his permission to be questioned.

The interrogation took place inside a room in the Everett Police station. L.D.E.P. sat closest to the door and Kowalchyk was on the other side of a desk opposite of L.D.E.P. L.D.E.P.'s father testified that L.D.E.P. volunteered for the interview. Olsen observed a live video feed of the interview from another room.

The State concedes that the record does not support the trial court's finding that L.D.E.P.'s father was present for half the interrogation.[2] The interview lasted three

---

[2] Wash. Court of Appeals oral argument, State v. L.D.E.P., No. 84081-9-I (July 18, 2023), at 14 min., 35 sec., *video recording by* TVW, Washington State's Public Affairs network, https://tvw.org/video/division-1-court-of-appeals-2023071122/?eventID=2023071122.

hours and L.D.E.P.'s father remained in the room for about 40 minutes. However, substantial evidence supports the other findings of fact.

When asked if anyone asked him if he wanted to do the interview, L.D.E.P. testified, "I had the option if I wanted to do it or not." L.D.E.P. testified he did not know who spoke to him first about the interview, but knew in advance that he was going to the police station to be interviewed. Kowalchyk spent 40 minutes speaking to L.D.E.P. and his dad and advising L.D.E.P. of his constitutional rights. Kowalchyk testified that she read L.D.E.P. his constitutional rights and his juvenile rights. L.D.E.P. and his father both signed a City of Everett Police Department Recorded Witness Statement form.[3] At trial, L.D.E.P. testified that he understood everything that was read to him from this form despite answering "I don't think so" when asked if he understood that he had the right to

---

[3] The form signed by L.P. and his father stated:

Do you understand this statement is being recorded? Yes _X_ No__

CONSTITUTIONAL RIGHTS:

_____, do you understand that you have the right to remain silent? That any statement you make can and will be used as evidence against you in a court of law? (If you are under the age of 18, your statement may be used against you in a Juvenile Court prosecution for a juvenile offense and may also be used against you in an adult court criminal prosecution if the Juvenile Court decides that you are to be tried as an adult).

That you have the right at this time to an attorney of your own choosing, to have him present and to consult with him before and during any questioning or the making of any statement, and at all other stages of these proceedings? That if you desire but cannot afford an attorney of your own choosing, one will be appointed for you at public expense?

That you may exercise your rights at anytime?

Do you understand these rights?

Knowing these rights, are you willing to talk to the police at this time?

talk to an attorney. L.D.E.P. testified that he understood he was free to leave the interview. The interview ended when L.D.E.P. said he was done and wanted to go home.

This court reviews a trial court's findings of fact for substantial evidence to "'determine only whether the evidence most favorable to the prevailing party supports the challenged findings, even if the evidence is in conflict.'" DeVogel v. Padilla, 22 Wn. App. 2d 39, 48, 509 P.3d 832 (2022) (quoting Thomas v. Ruddell Lease-Sales, Inc., 43 Wn. App. 208, 212, 716 P.2d 911 (1986)). Here, the evidence most favorable to the State supports the challenged finding.

We conclude that substantial evidence supports the trial court's findings which in turn support the court's conclusions that L.D.E.P. was not in custody and that his statements made to Kowalchyk were admissible.

We affirm.

_____
Coburn, J.

WE CONCUR:

_____
Hazelrigg, ACJ

_____
Smith, C.J.